PAUL L. TOBIN & another *vs.* WILLIAM P. CODY, SENIOR, & others.

Bristol. January 4, 1962. — March 5, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Sale,* Sale of stock, Contract of sale. *Contract,* Agreement not to compete, Release. *Good Will. Release. Unlawful Interference. Unfair Competition. Equity Pleading and Practice,* Master: findings; Decree; Suit to enforce agreement not to compete; Rehearing.

A master's findings were conclusive where his report did not disclose error on its face and appeared to be complete and contained no findings which were inconsistent, contradictory or plainly wrong, and no motion to recommit the report was filed. [717]

Where a family owning one half of the stock of a corporation, having a name identified with the corporate name, and participating actively in the business sold all their stock in the corporation to it for a substantial price pursuant to an agreement with it and the owners of the other half of its stock, a family also actively participating in the business, and the sellers relinquished any offices they held in the corporation and severed all connection with it, there arose in the circumstances an implied covenant on the part of the sellers not to compete with the business, even though its good will was never mentioned or evaluated and no trade secrets or secret lists of customers were involved. [720–722]

A corporation's ratification of an agreement made between two groups of its stockholders for the sale of the stock of one group to the corporation did not operate to release the sellers from an implied covenant not to compete with the corporate business. [722]

A conclusion by a master in a suit in equity, that activities of the sellers of one half of the stock in a corporation engaged in the steel and scrap metal business in a city to the corporation pursuant to an agreement with it and the owners of the other half of the stock derogated from the value of the interest sold, was warranted by findings that before the sale the sellers had long participated actively in the business, that four years after the sale they activated a new corporation formed by them for the scrap metal business and began operations therein at a location a short distance from the first corporation's place of business, and that they then solicited its customers. [723]

An implied covenant by a seller of an interest in a business not to engage in a competing business should be construed as limited to a reasonable time and a reasonable space. [723]

Upon the findings of a master in a suit in equity by a corporation to enforce an agreement not to compete with its business, a final decree permanently enjoining individual defendants formerly active in the business and having a surname identified with the corporate name, and a second corporation formed by them, from competing with the business in all of a certain county was proper as to time, but, on a finding merely that the plaintiff did business "in and about" one city in that county, the case was remanded to the trial court for further hearing to determine the proper area to be covered by the injunction.   [723–724]

BILL IN EQUITY, filed in the Superior Court on July 7, 1960. The suit was heard by *Noonan, J.*, on a master's report.

*Chris Byron,* (*Jack London* with him,) for the defendants.

*William A. Torphy,* for the plaintiffs, submitted a brief.

KIRK, J.   The defendants have appealed from a final decree permanently enjoining them from engaging in the scrap metal business in Bristol county and from soliciting customers of the plaintiffs.   There is also an appeal from an interlocutory decree confirming the master's report.

We dispose of the appeal from the interlocutory decree first.   The master's report does not disclose error on its face.   It appears to be complete in all essentials and is not inconsistent, contradictory or plainly wrong.   No motion was filed to recommit the report for a fair summary of the evidence or for any other purpose.   In these circumstances the interlocutory decree confirming the report was properly entered.   We need not consider the objections to the report.   We accept the master's findings as final.   *Dodge* v. *Anna Jaques Hosp.* 301 Mass. 431, 435.   *Macera* v. *Mancini,* 327 Mass. 616, 620–621.   *Shaw* v. *United Cape Cod Cranberry Co.* 332 Mass. 675, 678–680.   *New England Overall Co. Inc.* v. *Woltmann, ante,* 69, 74–75, and cases cited.

The main question presented is whether the facts found by the master justify the relief granted by the final decree. More particularly, the issues are whether there was as the result of an agreement in 1956 between the plaintiffs and the defendants an implied covenant by the defendants not to compete with the plaintiffs, and if so whether the injunction granted was too broad.

The master found that Cody and Tobin, Inc. (the corporation), one of the plaintiffs, was organized many years ago

as the successor to a partnership which was engaged in the scrap metal business in and about New Bedford. The elder Tobin, now deceased, and the defendant William P. Cody, Sr. (Cody, Sr.), were the original partners and later the original and principal stockholders in the corporation. They and their respective families were friendly over the years. A close friendship of long standing existed between the plaintiff Paul L. Tobin (Paul), son of the now deceased elder Tobin, and the defendant William P. Cody, Jr. (Cody, Jr.). In due time Paul and his brother Joseph, and Cody, Jr., entered the family business. Each of the families held fifty shares of the one hundred shares of stock issued by the corporation. Of the fifty shares held by the Cody family, Cody, Sr., owned forty-nine and Cody, Jr., one.

In 1942, Cody, Jr., and Paul left their work with the corporation. For some years thereafter the business was run by the elder Tobin and Joseph, and Cody, Sr. Upon the elder Tobin's death, his stock went to his sons.

By 1956, Cody, Jr., and Paul had reëntered the family business. At that time the corporation in addition to buying scrap metal was to a limited extent buying and selling new steel. Early in 1956, Cody, Jr., stated to Paul that he "saw no future in the scrap metal business." At Cody, Jr.'s suggestion they consulted the Codys' lawyer on March 10, 1956, and, after a lengthy and friendly conference where careful consideration was given to the corporation's assets and liabilities, a purchase and sale agreement was executed by Cody, Sr., and Cody, Jr., as sellers, and the Tobin brothers, as buyers, of the fifty shares of stock owned by the Codys. The good will of the business was never mentioned or evaluated in the discussion or in the purchase and sale agreement. There were no trade secrets in connection with the business and the list of customers was not secret. The purchase price was approximately $25,000. The agreement provided for the execution of a release by the corporation to the sellers of their debts and obligations. Because of the difficulties encountered by the Tobins in raising cash to buy the stock, a supplemental agreement was made by the

parties and the corporation on April 6, 1956, ratifying the
earlier agreement and providing that ''the stock certificate
be sold by the said Codys to the corporation'' and that· de-
livery be made at a bank which advanced the money with
the stock as security.    The check for the stock was payable
to Cody, Sr.

The master found that, having in mind the price paid and
the relations between the parties, the Tobins intended to
buy and reasonably thought they were buying all of the
Cody interest in the corporation, including the prospect of
any competition from them in ''New Bedford, if not in
Bristol County and in adjacent parts of Plymouth County'';
and that Cody, Jr., had no ''intention of going back into the
scrap metal business.''    Cody, Jr., although he owned only
one share of the stock, knew of and participated in all de-
tails of the transaction.    Cody, Sr.'s knowledge of the
transaction was equal to Cody, Jr.'s.

Since the purchase, Paul has run the corporation's busi-
ness at the same place in New Bedford and under the same
name.[1]    Cody, Jr., was out of the Commonwealth most of
the time after 1956.    He returned in 1959, however, and in
1960, activated the defendant Cape Cod Iron Works, Inc.
(which had been incorporated somewhat earlier by the
Codys), in the scrap metal business.    He was unable to get
a license to do business in Fall River, and thereupon began
operations at a location which is a short distance from the
plaintiff corporation's place of business in New Bedford.
The plaintiff corporation's customers have been solicited
by Cody, Jr.

The master reported that Cody, Sr., although of ad-
vanced years was a party to the litigation whose failure to
appear or to testify at the trial was not explained in any
way.    From this fact and other evidence, he inferred on the
part of Cody, Sr., knowledge of, and participation in, the
business activities of Cody, Jr., and the Cape Cod Iron
Works, Inc.    He found that the activities of the Codys and

---

[1] Joseph Tobin, because of illness, sold his stock to Paul and is not a party
to the litigation.

Cape Cod Iron Works, Inc., were in derogation of the sale of stock to the plaintiffs in 1956.

We think that the facts found by the master justify the conclusion that there was an implied covenant by the defendants not to compete. The existence and scope of an implied covenant not to compete depend upon the circumstances attending the contract of sale and the nature of the business or the interest which is sold. *Hoxie* v. *Chaney,* 143 Mass. 592, 594, 595–597. Levin, Non-Competition Covenants in New England, 39 B. U. L. Rev. 482, 500–502. Although good will was not mentioned, the sale by the Codys of all the stock held by them, the relinquishment of any offices in the corporation, and the severance of all connection with it constituted a complete divestment of their interest in the corporation and a transfer of that interest to the plaintiffs remaining in the business. It was the equivalent of the sale of "all the property and assets" which they had. "[O]rdinarily when the entire assets of a business are sold 'it is presumed that the good will passes with the other assets.' *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 568. *Lynn Tucker Sales, Inc.* v. *LeBlanc,* 323 Mass. 721, 723." *Pitman* v. *J. C. Pitman & Sons, Inc.* 324 Mass. 371, 374. And this is so even though the sale agreement omits to mention good will in the transfer of the business. *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 568, and cases cited. *Lynn Tucker Sales, Inc.* v. *LeBlanc,* 323 Mass. 721, 723.

Our decisions have made it clear that in the voluntary transfer of good will, whether by express terms or otherwise, there is implied an agreement by the seller not to compete with the purchaser in such a manner as to derogate from the value of that which is sold. *Old Corner Book Store* v. *Upham,* 194 Mass. 101, 104–105. *Highland Laundry Co. of Lowell* v. *Wotton,* 293 Mass. 322, 326–327. *Perkins* v. *Becker's Conservatories, Inc.* 318 Mass. 407, 413. *Auslyn, Inc.* v. *Rousseau,* 321 Mass. 735. *Lynn Tucker Sales, Inc.* v. *LeBlanc,* 323 Mass. 721, 724. *Pitman* v. *J. C. Pitman & Sons, Inc.* 324 Mass. 371, 374. The same rule

applies when a partner conveys his interest in a partnership to a copartner. *Old Corner Book Store* v. *Upham,* 194 Mass. 101, 106–107. *Foss* v. *Roby,* 195 Mass. 292, 296–297.

We think that the reasoning underlying the cited cases is applicable to the case before us. While it may be true that the good will of the business belongs to the corporation as an entity and not to the stockholders as such, the value of the good will is reflected in the value of the stock which was the subject of the sale. Where, therefore, the sellers of the stock have been active participants in the business and are in a position to control or affect its good will, we think not only that they may validly bind themselves by an express promise not to derogate from the good will reflected in the value of the stock sold by competing with the buyers remaining in the business, but also that in appropriate circumstances such a promise can be implied in the sale of the stock itself.

This view has support. ''The sale by a shareholder, who participates substantially in the control of the corporation, of his shares and his interest in the good will of the corporation has been treated as if it were a sale by a partner of his interest in the partnership business carrying the usual implied restriction upon a vendor's subsequent competition with the corporate business in derogation of the good will transferred.'' Williston, Contracts (Rev. ed.) § 1640, p. 4595. *Komow* v. *Simplex Cloth Cutting Mach. Co. Inc.* 109 Misc. (N. Y.) 358, aff'd. 191 App. Div. (N. Y.) 884. See Restatement: Contracts, § 516 (a), comment c. See also *Durham* v. *Lewis,* 231 Ky. 601; *Buckhout* v. *Witwer,* 157 Mich. 406 (express covenants).

In determining whether a promise not to compete has been implicitly made by the seller of stock who has formerly participated in the corporation's business, the number of shares held and sold by the seller is a factor but not necessarily a decisive factor. The amount of money paid by the buyer, the identity of the names of the sellers with one another and with the corporate name, and the duration and importance of the seller's association with the business may

well be, as doubtless they were here, of major significance in arriving at such a determination.

As this court stated in *Marshall Engine Co.* v. *New Marshall Engine Co.* 203 Mass. 410, 424, "The ground on which it is held that a covenant not to engage in a business similar to that sold is valid when expressed, is the very ground on which a covenant not to engage in a similar business is sometimes implied from a sale of the good will of a business, namely, *that it is necessary to give to the purchaser what is sold to him*" (emphasis supplied). We think that an express covenant by the defendants not to derogate from the good will of the corporation by competing with it would clearly have been valid under the circumstances. The master found that "any reasonable person in the Tobins' position would have believed unequivocally that the Tobins were buying out any competition from the Codys . . .." This is equivalent to a finding that there was an implied promise by the Codys not to compete. In so far as this finding involves a question of law, we think it is supported by other findings made by the master. In so far as it is a pure finding of fact, it is not inconsistent with other findings of the master and, in the absence of a report of the evidence, cannot be disturbed.[2]

The defendants' contention that the supplemental agreement of April 6, 1956, whereby the corporation ratified the purchase and sale agreement, operated to release them of their covenant not to compete with the corporation cannot prevail. So far as appears, there was no general release as in *Pitman* v. *J. C. Pitman & Sons, Inc.* 324 Mass. 371. There is nothing in the supplemental agreement to suggest that what was intended to ratify all of the rights and duties of the parties to the original agreement should have the effect of extinguishing any of them.

---

[2] We think it was proper and helpful, although not indispensable to the result, for the master to consider the conduct and statements of the Codys at and about the time of the transaction as bearing upon whether the sale of the stock carried with it an agreement not to compete. See *Hoxie* v. *Chaney*, 143 Mass. 592, 594. Cf. *Martin* v. *Jablonski*, 253 Mass. 451, 456–457; Levin, Non-Competition Covenants in New England, 39 B. U. L. Rev. 482.

The master found that the activities of the defendants derogate from the sale made to the plaintiffs in 1956. Whether a competing business derogates from the business sold is a question of fact and regard must be had to the nature of both of the businesses and the opportunities of the seller to interfere with or influence the business sold. *Anchor Elec. Co.* v. *Hawkes,* 171 Mass. 101, 104–108. *Martino* v. *Pontone,* 270 Mass. 158, 160. *Lynn Tucker Sales, Inc.* v. *LeBlanc,* 323 Mass. 721, 724, and cases cited. We see no reason to disturb the master's finding in this respect.

Finally, the defendants contend that the scope of the decree is unreasonably broad. Express covenants of the type here in question may be enforced if limited reasonably in time and space. "If the restriction is too broad as to time (*Metropolitan Ice Co.* v. *Ducas,* 291 Mass. 403) or territory (*Whiting Milk Co.* v. *O'Connell,* 277 Mass. 570, 574), it may be enforced to the extent necessary to protect the plaintiff." *Cedric G. Chase Photographic Laboratories, Inc.* v. *Hennessey,* 327 Mass. 137, 139. See *Bonneau* v. *Meaney, ante,* 368, 370–371, and cases collected. Where, however, the covenant is implied, it should be construed in the first instance so as to be within reasonable limits of time and space.

The injunction here is a permanent one. It is, however, not thereby unreasonable per se. See *United Shoe Mach. Co.* v. *Kimball,* 193 Mass. 351, 358. We have in the past upheld injunctions of this sort. *Old Corner Book Store* v. *Upham,* 194 Mass. 101, 106–107. *Foss* v. *Roby,* 195 Mass. 292, 297. *Marshall Engine Co.* v. *New Marshall Engine Co.* 203 Mass. 410, 424. See *Rosenberg* v. *Adelson,* 234 Mass. 488; *Auslyn, Inc.* v. *Rousseau,* 321 Mass. 735. See also *Smith* v. *Brown,* 164 Mass. 584, 585; Williston, Contracts (Rev. ed.) § 1638; Restatement: Contracts, § 515, comment c, *id.* § 516, illustration 2. Cf. *Bonneau* v. *Meaney, ante,* 368, 370–371, (twenty year express covenant upheld). In the light of the relatively small area covered by the injunction and the identity of the names of the defendants and the plaintiff corporation, we cannot say that the

judge was unwarranted in concluding, as he must have, that the power of the defendants to derogate from the value of what was sold will continue during the defendants' lives. We, therefore, cannot say that, with regard to time, the injunction afforded the plaintiffs any more protection for their good will than was reasonably necessary.

The decree enjoins the defendants from competing in all of Bristol county. Although the area covered may not be unreasonably large in fact, the findings do not support its scope. There are no facts in the master's report from which the inference could be drawn that the good will of the plaintiff corporation was operative in all of Bristol county. The only finding in this regard was that the corporation had, prior to March, 1956, done business "in and about New Bedford."

For this reason we think that there should be a further hearing to determine whether the good will of the plaintiff corporation extended beyond the city of New Bedford and whether consequently the area covered by the injunction should be extended beyond that city. Whether the case should be committed to the master or heard by the court is for the Superior Court to determine. *Frank* v. *Frank,* 335 Mass. 130, 137. Pending such determination the final decree is to be modified by enjoining the defendants from engaging in the steel, scrap, and used metals business in the city of New Bedford. In so far as the final decree enjoins the defendants from soliciting customers of the plaintiff corporation for the purpose of buying or selling steel, scrap or used metals, and in all other respects, it is affirmed. The interlocutory decree is affirmed.

*So ordered.*