C. K. Smith & Co. Inc. *v.* Charest.

C. K. SMITH & CO., INC. *vs.* ARSENE D. CHAREST
& another.

Worcester.    November 2, 1964. — January 5, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Contract,* Covenant against competition. *Good Will.    Unfair Competition.*

In the circumstances, where a corporation engaged in the fuel oil and oil burner businesses sold its fuel oil business to a buyer also engaged in such businesses, one who was substantially the owner of the seller corporation becoming an employee of the buyer to manage the business sold, and the contracts between the parties expressly reserved to the seller corporation and its owner in connection with it the right to continue in the oil burner business but were silent as to who should repair and service the oil burners of fuel oil customers, there was no implied covenant by the buyer not to engage in such repairing and servicing, nor did the buyer's engaging therein constitute unfair competition.

BILL IN EQUITY filed in the Superior Court on March 12, 1962.

Following the report of a master the defendants appealed from interlocutory decrees confirming the report and denying a motion to recommit and from the final decree, all entered by *Ford,* J.

*Sumner W. Elton* for the defendants.

*Richard W. Mirick* (*Robert J. Martin* with him) for the plaintiff.

REARDON, J.    The plaintiff, C. K. Smith & Co., Inc. (Smith), seeks to enjoin the defendant, Arsene D. Charest (Charest), from engaging in the sale of fuel oil to individuals in the city of Worcester or "within the limits of the municipalities adjoining Worcester," which is allegedly contrary to the terms of a written agreement, and seeks to recover damages for alleged breaches by the defendants, Charest and Pelkey Oil & Heating, Inc. (Pelkey), of the agreements entered into by the parties.

A master found the following facts. Smith and Pelkey are Massachusetts corporations, each having a usual place of business in Worcester. Smith is, and has been for many years, principally engaged in selling fuel oil, coal, oil burners and related items, and has also engaged in the installation, servicing and repairing of oil burners. Charest was employed by Smith prior to 1947 "for about two years as its service manager." From 1947 to 1954, Smith and Pelkey were "business competitors in the same general territory," Pelkey having been organized in 1947 to sell fuel oil, oil burners and related items, and to install, service and repair oil burners.[1]

In 1953, Pelkey found itself in financial straits, and on March 30, 1953, Smith agreed to loan money to Pelkey, in return for which Pelkey pledged, on certain terms, its accounts receivable to Smith. During the several months prior to August, 1954, Pelkey found itself unable to carry out the agreement of March 30, 1953, and following negotiations on August 6, 1954, two agreements were executed. In the first of these Pelkey sold to Smith a substantial part of its assets, including its accounts receivable and the right to use the name "Pelkey Oil Company." Pelkey also agreed that it would not engage in the sale of fuel oil to customers in Worcester "or in any of the adjoining municipalities for a period of five (5) years from August 6, 1954." Pelkey retained the right to sell oil burners and to deal in its real estate and in other assets not sold to Smith.

By the second instrument Charest agreed to become an employee of Smith "and act as office manager of that portion of . . . [Smith's] fuel business which was purchased from . . . [Pelkey] to be thereafter carried on under the name of 'Pelkey Oil Company' " at 772 Main Street, Worcester, which had been Pelkey's office previously. Among Charest's duties as manager was the solicitation of new

---

[1] From 1947 to November 17, 1961, Charest was president, treasurer and a director, as well as ninety-nine per cent owner, of Pelkey. On the latter date he resigned as an officer and director and assigned his stock without consideration to his three children.

business and the collection of the assigned accounts receivable. Charest agreed that while employed by Smith, and for five years after his employment was terminated, he would not sell fuel oil in Worcester or its environs. He agreed further to "devote his best efforts and ability and the majority of his time and attention throughout the period of such employment to the 'Pelkey Oil Company'." He retained the right under the agreement to sell and install oil burners and to be "connected with the Pelkey Oil & Heating Inc. . . . so long as the said corporation does not engage in the sale of fuel oil to any of the customers whose accounts receivable were sold by . . . [Pelkey] to . . . [Smith] or to any other person or persons." Both agreements are silent on the question of which party would repair or service the oil burners or heating equipment of the customers whose accounts receivable were sold by Pelkey to Smith, or of those new customers whom Smith might acquire under the name "Pelkey Oil Company."

From August 6, 1954, to September 1, 1961, "Pelkey Oil Company" was operated by Smith under the management of Charest. Its main office at 772 Main Street was rented by Smith from Pelkey. At the same office Pelkey operated its oil burner service and repair business, which it has continually conducted from 1947 to the present. During the occupancy of "Pelkey Oil Company" at 772 Main Street telephone calls for fuel oil or for service from customers of "Pelkey Oil Company" or Pelkey were usually taken by Charest or, in his absence, by employees of either co-occupant. Calls for oil were transferred to Smith; calls for service were referred either to Pelkey or to Smith's service department. Until 1960 employees of Smith at 772 Main Street were under no instructions to refer service calls to Pelkey. In the period from August, 1954, to August, 1961, "there were occasional discussions and complaints between . . . [Smith] and Charest with respect to service. Charest protested on these occasions that the repair and service calls should be attended to by . . . [Pelkey] but neither party considered them of sufficient consequence to terminate

the relationship as employer and employee or as co-occupants of the office located at 772 Main Street in Worcester.'' In 1960 Smith instructed its employees to refer all calls for service and repairs made to ''Pelkey Oil Company'' to Pelkey, and thereafter, until September 1, 1961, Smith neither solicited nor performed service or repair work for any customer of ''Pelkey Oil Company.''

On August 29, 1961, Smith wrote to Charest informing him that as of September 1, 1961, the office of ''Pelkey Oil Company'' would be moved from 772 Main Street to 274 Main Street, and that Smith would ''perform all necessary service for 'Pelkey Oil Company' customers.'' In early September, 1961, Charest and Pelkey began to solicit customers of ''Pelkey Oil Company'' for fuel oil business. Over a period of three heating seasons the fuel oil business of ''Pelkey Oil Company'' diminished from over 500,000 gallons to about 20,000 gallons. A substantial part of this business transferred to Pelkey.

On the basis of these subsidiary findings the master found that Pelkey was prohibited by its contract from engaging in the fuel oil business until August 6, 1959, and that Pelkey was free after that date to solicit ''Pelkey Oil Company'' customers. He further found that the employment contract with Charest was in force on September 1, 1961, and that under its terms Charest was prohibited from engaging in the sale of fuel oil ''in the City of Worcester or within the limits of the municipalities adjoining Worcester'' for five years after its termination. The master concluded that Charest was liable for a breach of contract and that Smith was under no duty to refrain from competing for the service and repair work of the customers of ''Pelkey Oil Company.'' Damages were assessed against Charest in the amount of $20,235.96. A stipulation was filed with the papers of the case that Charest would ''not engage in or be in any way connected with the sale of fuel oil to customers within the City of Worcester or within the limits of the Municipalities adjoining Worcester until September 1, 1966.'' A final decree was entered modifying the master's report

by assessing damages against Pelkey as well as against Charest and enjoining Charest for a period of five years from September 1, 1961, from selling fuel oil in and around Worcester. From this decree, as well as from interlocutory decrees, Charest and Pelkey have appealed.

Charest and Pelkey have limited the argument contained in their brief to the questions of whether there was an implied covenant by Smith not to compete for the service and repair business of "Pelkey Oil Company" customers and of whether such activity by Smith constituted unfair competition. Accordingly, we do not pass on other exceptions to rulings made by the judge in the Superior Court. Rule 13 of the Rules for the Regulation of Practice before the Full Court, 345 Mass. 787.

Two recent cases have dealt with the issue of an implied covenant not to compete. In *Tobin* v. *Cody,* 343 Mass. 716, and *Cap's Auto Parts, Inc.* v. *Caproni,* 347 Mass. 211, part owners of businesses sold their interests to their co-owners. No mention of good will or of subsequent competition was made in the negotiations or agreement presented in the *Tobin* case. A similar silence existed in the *Cap's Auto Parts, Inc.* case although there was evidence of oral statements by the seller that he would do nothing to harm the corporation. It was held in each case that the seller impliedly covenanted not to compete. The sellers were held bound by an implied promise "not to derogate from the good will reflected in the value of the stock sold by competing with the buyers remaining in the business . . . ." *Tobin* v. *Cody, supra,* at 721.

The defendants contend that the circumstances of the sale imposed upon Smith as the purchaser of business assets an implied agreement not to compete with the seller in any aspect of the oil business with which the sale was not expressly concerned. We assume that such an agreement could arise by implication although the two cases just cited indicate that the implications are more generally in favor of the buyer of a business than against him. In any event, in this case the facts plainly do not require the conclusion of an implication against the buyer. The master found

that the agreements stemmed from extensive negotiations at which the parties were represented by counsel. It would be expected that restrictions upon a buyer who is acquiring assets to expand his rights would be subject to an express agreement.

The defendants have not contested the master's finding that the repair and service business is an important aspect of the fuel oil business. Presumably it is also important to the oil burner business. It would be unreasonable to conclude that Smith, in taking over that part of Pelkey's operations which dealt in the sale of fuel oil, would agree not to provide the service which would be needed by fuel oil customers. We note further that Smith extended service to "Pelkey Oil Company" customers while the agreement remained in force. Where parties act on a particular construction of written instruments "such construction will be of great weight and will usually be adopted by the court." *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 569. *Ovans* v. *Castrucci,* 267 Mass. 600, 605, and cases cited.

*Henry Perkins Co.* v. *Perkins,* 246 Mass. 96, 99, and *Hunt Potato Chip Co.* v. *Hunt,* 340 Mass. 371, relied upon by Charest and Pelkey, are clearly distinguishable. In the *Perkins* case an issue of unfair competition was presented, and where the plaintiff's trade name had acquired secondary meaning it was held that the defendant could not do business under a similar name in such a manner as to cause possible confusion among those to whom both parties looked for business. The *Hunt* case reached a similar result. The rationale of these cases clearly rests on considerations quite dissimilar to those now before us. In this instance the name "Pelkey" has undergone a form of division and has been attached to two enterprises. Cf. *Franks* v. *Markson,* 337 Mass. 278, 285. The confusion which has resulted is best resolved by a reasonable view of the business in which the parties are engaged and the manner in which they have comported themselves from the date of the execution of the agreements. Thus, the order must be

*Interlocutory and final decrees affirmed.*