THE NORTH CENTRAL COMPANY v. PHELPS AERO, INC.

139 N. W. (2d) 258.

November 26, 1965—No. 39,735.

414

L. L. Schroeder, for appellant.
Eugene M. Warlich and Doherty, Rumble & Butler, for respondent.

SHERAN, JUSTICE.

Appeal from a judgment of the district court.

An action was instituted by The North Central Company, a corporation concerned with the operation of insurance and financial enterprises, against Phelps Aero, Inc., a firm engaged in the air transportation business, to recover sums due for plane rental by terms of a written lease and amendment both dated March 10, 1961. By answer defendant asserted that nonpayment was excused because plaintiff permitted others to rent the plane, and counterclaimed for damage on the theory that this conduct amounted to a tortious interference with its business.

The trial judge entered findings of fact and conclusions of law in favor of plaintiff ordering judgment in the amount of $5,501 with interest. It is from this judgment that the appeal was taken.

## Trial Court Findings

We summarize the amended findings of fact and conclusions of law which are to be reviewed:

The March 10, 1961, lease consists of an original agreement (and an amendment thereto) providing in part as follows:

"The North Central Company, a Minnesota corporation herein called the 'lessor', hereby agrees to lease to Phelps Aero, Inc., a Minnesota cor-

poration herein called the 'lessee', and lessee hereby agrees to lease from lessor the following described aircraft, which is hereinafter called the 'aircraft':

"MODEL                 SERIAL NO.         REGISTRATION NO.
Aero Commander 500      618F-1             N8447C

"It is expressly understood and agreed that this is an agreement for leasing only and that lessee acquires no right, title, or interest other than as lessee in the aircraft under this agreement.

"In consideration of the mutual covenants herein contained, the lessor and lessee hereby agree as follows:

"1.   TERM

"Subject to the provisions for termination hereinafter set forth, the initial term of the lease shall be two years, commencing on the date of this agreement; * * *.

"2.   USE OF THE AIRCRAFT

"It is understood and agreed by the parties that this lease shall not grant the right of exclusive use of the aircraft to the lessee. The lessee shall have the right to use the aircraft at such times as its use does not conflict with any scheduled use of the aircraft by lessor. * * *

                    *    *    *    *    *

"Lessee agrees that it shall not permit the aircraft to be used in violation of any federal, state, or municipal law or regulation and shall be solely responsible for any fine, penalty, or forfeiture occasioned by any violation thereof. * * *

"3.   RENT

"During the first year of the lease, lessee agrees to pay to the lessor a minimum monthly rental of $720.00 and, in addition thereto, an hourly rent at the rate of $36.00 per hour for each hour the aircraft is used by lessee in excess of 20 hours during any one month.

"During the second and all subsequent years that the lease remains in effect, lessee agrees to pay to the lessor a minimum monthly rental of $1,080.00 and, in addition thereto, an hourly rent at the rate of $36.00 per hour for each hour the aircraft is used by lessee in excess of 30 hours during any one month.

"The minimum monthly rental provided for above contemplates that

the aircraft will be available for use by lessee at least 50% of the time during each month that this agreement remains in force. If, due to use of the aircraft by lessor, the aircraft is actually available for a lesser portion of such month, then lessee shall be liable only for the proportional hourly rental provided for above with respect to such month.

\* \* \* \* \*

"6.   TERMINATION OF LEASE

\* \* \* \* \*

"(c)  The lessor may terminate this lease at any time without notice to the lessee upon the happening of any of the following events:

"(1)  A default in excess of 15 days in the payment of any rents or other moneys owed by the lessee to the lessor."

The amendment to this lease, which is also dated March 10, 1961, provides:

"In the event lessee does not use the aircraft for at least 20 hours during any one month of the first year of this Agreement, then the difference between the hours of actual use and 20 hours shall be carried forward and applied as a credit against hours of use in subsequent months. If the lessee does not use the aircraft for at least 30 hours during any one month of the second or any subsequent year this Agreement remains in effect, then the difference between the hours of actual use and 30 hours shall be carried forward and applied as a credit against hours of use in subsequent months."

Defendant made all required payments until February 10, 1962. It failed and refused to make payments due for rentals between that time and September 7, 1962, on which date the lease was terminated. The plane rent payable for this period (excluding $425 due for the services of a pilot made available pursuant to an oral agreement with which we are not now concerned) amounts to $5,076.

The findings of the trial court in effect reject the claim of the defendant that it sustained damage caused by plaintiff's illegal interference with a business relationship. It did find the March 10, 1961, lease to be "illegal and voidable," but rejected defendant's claim that illegality prevented recovery of the rentals due by the terms of the lease.

## The Issues

Upon appeal Phelps Aero, Inc., argues: (1) The evidence reasonably supports a finding that North Central effectively and intentionally prevented performance by Phelps when it knowingly, and in evasion of the law, rented the subject aircraft commanded by the same pilot at a lower rate than could be charged by Phelps; (2) the evidence reasonably supports a finding that North Central, with no legal interest to justify its conduct, with no pretense of legality, and with malicious intent, interfered with and meddled with the business activities of Phelps to the direct injury of its prospective contracts in air transportation and to its damage; (3) the trial court in its amended findings correctly declared the contract to be illegal but erred in permitting plaintiff to recover on a contract voidable by reason of its wrongdoing where the public safety and interest was involved; (4) the prohibition in the state licensing law and the Federal Aviation Act reflects the legislative intent for a plan or scheme to protect the public interest and the public safety and to protect those engaging in air transportation against unreasonable competition in the interest of the public safety, a contract in violation of the legislative intent being void.

The legal issues raised by these contentions are:

(1) Was the agreement of March 10, 1961, one forbidden by law and of such a nature as to bar an action to recover rentals due according to its terms?

(2) If the answer to the first question is in the negative, is it to be implied as a term of the agreement that plaintiff would refrain during the period of the lease from making use of the plane available to persons who would otherwise charter it from defendant?

(3) If the answer to the second question is in the affirmative, would the evidence in the record support a finding that plaintiff permitted persons to use the leased plane who, were it not for this fact, would have chartered it from defendant?

## Decision

■ The most recent statement of this court with respect to recovery on a contract where a party to it has failed to obtain a license or cer-

tificate as required by law appears in Lew Bonn Co. v. Herman, 271 Minn. 105, 108, 135 N. W. (2d) 222, 225, in this language:

"Although the general rule is that a contract entered into in violation of a statute which imposes a prohibition and a penalty for the doing of an act, such as the pursuit of a business, profession, or occupation without procuring a license or permit required by law for the protection of the public, is void, such rule is not to be applied without first examining the nature and circumstances of the contract in light of the applicable statute or ordinance. In construing such a statute or ordinance, courts will infer that the legislature did not intend that an instrument executed in violation of its terms should be void unless that be necessary to accomplish its purpose. 4 Dunnell, Dig. (3 ed.) § 1873."

It is at least doubtful that the act of plaintiff in leasing its plane to defendant pursuant to the March 10, 1961, agreement (considered apart from any other uses of the plane subsequently permitted by plaintiff to others) made it subject to Federal law or regulations enacted pursuant thereto requiring an air carrier operating certificate; or to any law of the State of Minnesota requiring a commercial operator's license.[1]

However, even though it be assumed that such a certificate or license became required by reason of the contract, recovery of rentals due was properly allowed by the trial court because there is no evidence to indicate that the performance of the contract in the absence of plaintiff's possession of such certificate or license created any hazard to public health or safety. As a result, the purposes of Federal and state registration requirements would not be served by ruling this contract void. Lew Bonn Co. v. Herman, *supra;* Weatherston's Associated Services v.

---

[1] For the relevant provisions, see 72 Stat. 754, 49 USCA, § 1371(a), which prohibits the engagement in "air transportation" without a certificate. "Air transportation" is defined in 72 Stat. 737, 738, 49 USCA, § 1301(10, 21), construed in Las Vegas Hacienda, Inc. v. Civil Aeronautics Bd. (9 Cir.) 298 F. (2d) 430, and M & R Investment Co. v. Civil Aeronautics Bd. (9 Cir.) 308 F. (2d) 49.

Minn. St. 360.018, subd. 1, authorizes the commissioner of aeronautics to license persons engaged in "commercial operations," as defined in Minn. St. 360.013, subd. 11, and Reg. 9315(a), Minn. Regulations Relating to Aeronautics (1959 ed.). See, also, Reg. 9319.

Minnesota Mutual Life Ins. Co. 257 Minn. 184, 100 N. W. (2d) 819. This is particularly true here since the contract obligated defendant to provide all certificates and licenses necessitated by its use of the plane and to use the plane in conformity with all Federal, state, and municipal laws and regulations.

■ The purpose of the agreement from the standpoint of plaintiff was to secure revenue for the use of its plane at times when it was not in use in the ordinary course of its business as a holding company. The object of the contract from the standpoint of defendant was to have available a plane which it could charter to others in the course of its business of providing air transportation on a trip basis to persons having need for such a service. Although the trial court made no finding on this aspect of the matter, it may reasonably be argued that the parties intended at the time the agreement was made that plaintiff would refrain during the period of the lease from depriving defendant of charter business which it would have secured were it not for competition by plaintiff.[2] If this be implied as a term of the contract, defendant would be excused from performance on its part to the extent that such implicitly forbidden conduct on the part of plaintiff prevented performance by defendant.[3] And if such conduct constituted a tortious interference with defendant's business relations,[4] defendant could have a cause of action for proximately caused damage on the theory embodied in its counterclaim. But whether this aspect of the matter be considered as an excuse for nonperformance by defendant or as the predicate for a cause of action for damages, it was incumbent upon defendant to show that plain-

---

[2] For situations where courts have found implied covenants not to compete, see Perkins v. Standard Oil Co. 235 Ore. 7, 383 P. (2d) 107, 1002; Tobin v. Cody, 343 Mass. 716, 180 N. E. (2d) 652; A. R. A. Mfg. Co. v. Pierce, 86 Ariz. 136, 341 P. (2d) 928; Adalex Laboratories v. Krawitz (Okla.) 270 P. (2d) 346. But see, Naftalin v. John Wood Co. 263 Minn. 135, 116 N. W. (2d) 91.

[3] See, 17A C. J. S., Contracts, § 468; Restatement, Contracts, § 295; Haase v. Stokely-Van Camp, Inc. 257 Minn. 7, 99 N. W. (2d) 898, 87 A. L. R. (2d) 726.

[4] See, Restatement, Torts, §§ 766 to 768; Snowden v. Sorensen, 246 Minn. 526, 75 N. W. (2d) 795.

tiff did in fact cause defendant to lose business revenue by permitting persons to use the plane who, but for such permitted use, would have purchased the charter service available from defendant.

These principles apply whether plaintiff's course of conduct in permitting the use of its plane by others did or did not make such use an enterprise requiring a certificate or license under either Federal or state law. If such certificate or license were required, the fact that plaintiff had none would strongly support the inference that the parties implicitly agreed that plaintiff would refrain from entering into competition with defendant. Apart from this, it would be reasonable to infer that plaintiff, even if it had acquired such a certificate or license, would avoid a situation where it collected rentals from defendant for the prospective use of the aircraft and at the same time satisfied the requirements of defendant's customers for such service by making the plane available to them at prices so low as to eliminate or reduce the market for the service.

But whether the conduct of plaintiff in making its plane available to persons other than defendant made it subject to certificate and license requirements which it did not meet, it was incumbent upon defendant in proving its case, by way of defense or counterclaim, to show by a fair preponderance of the evidence that this conduct on the part of plaintiff resulted in a loss of business by defendant which, were it not for plaintiff's actions, would have inured to defendant's benefit.

■ Evidence was introduced to show the identity of the persons to whom plaintiff granted the use of its plane during the period of the lease. These individuals and corporations fall into three general categories: (a) Corporations or employees of corporations owned or operated by plaintiff; (b) persons with whom defendant had no business relationships either before the inception of the lease or afterwards and from whom, so far as the evidence shows, defendant had no reason to expect a demand for its service; (c) the Hartzell Manufacturing Company, to which defendant had chartered flights on two occasions.

(a) It is clear from the record that the parties contemplated that plaintiff would make the use of the plane available to the corporations owned and operated by it during the term of the lease. Harold F. Phelps, Jr., president of defendant, acknowledged that he knew at the time the lease

was made that Theodore Sanborn, president of plaintiff, was also interested in the operation of other corporations owned and managed by North Central. It is not reasonable to attribute to North Central an intention to purchase a plane to meet the transportation needs of corporations in which it was interested and then to disable itself from making such use of the aircraft by entering into the March 10 arrangement with Phelps Aero, Inc. This much appears, implicitly, to be conceded by defendant, who filed with the trial court a pretrial statement of its claims specifying the Hartzell Company as being the prospective customer with whom, were it not for the conduct of plaintiff, it would have entered a charter arrangement and who, in its brief, describes North Central as a "financial holding company operating insurance companies and financial planning companies."

(b) In addition to the corporations owned or operated by plaintiff, and the employees of such corporations, the other corporations and individuals, exclusive of the Hartzell Company, who used the plane during the critical period were so few in number and the incidents involved are so insignificant that extensive consideration of the problem thus presented will serve no useful purpose.[5] It is sufficient to note that the record is completely barren of evidence to show the likelihood that these persons would have been in need of the services of defendant if they had not been afforded the use of plaintiff's aircraft.

(c) The most difficult phase of the case, and the one on which defendant relies principally, relates to the use of plaintiff's airplane by the Hartzell Company. Defendant's exhibit 7, which purports to be a summary statement of the income derived by plaintiff from the use of its plane during the period with which we are concerned, includes the following:

| "11/24/61 | Hartzell Mfg. | 50-2 | 649.20 |
| | * * * * * | | |
| 2/15/62 | Hartzell Mfg. | 95-3 | 451.81 |
| 7/24/62 | Hartzell Mfg. | 281-11 | 1,678.74 |
| 8/31/62 | Hartzell Mfg. | 327-6 | 96.02" |

[5] See Sallblad v. Burman, 225 Minn. 104, 29 N. W. (2d) 673, where this court exercised its judicial privilege of invoking the maxim "de minimis non curat lex."

Harold F. Phelps, Jr., testifying in support of defendant's case, testified upon direct and cross-examination:

On June 30, 1961, and again on December 21, 1961, aircraft owned by the defendant had been chartered by the Hartzell Company. At the time of the first charter, William E. Goodreid was an employee of Phelps Aero, Inc. Later he became an employee of North Central and was the person principally in charge of the airplane which was subject to the lease. From December 21, 1961, until May 31, 1962, Hartzell did not charter any planes of the defendant, but on that day it made inquiry concerning the availability of air transportation for a shipment of cargo to Richmond, Indiana. The cargo involved was of such a nature as to require larger aircraft than Phelps could supply. However, Phelps "lined up a DC-3" in an effort to meet the job requirements. The arrangement was not consummated because "[t]hey decided that it was not a rush job and that it could be handled by truck apparently." Having last served Hartzell on December 21, 1961, and having failed to secure the transportation business for which they had negotiated tentatively on May 31, 1962, in June Phelps called upon Murray J. Laub of the Hartzell Company because, as he said, "If we lose a trip or miss a trip or contact regarding a trip, we try to follow through on it and see if there is any further need of our service." With knowledge then acquired that Hartzell had been making use of the plane owned by North Central, Phelps called on Sanborn and told him that "if he wanted to get into the flying business, we should cancel this lease and that he should refund me the money that I had coming and that I had paid for and had not had an opportunity to fly out and that we should just drop our business relationship entirely. This, of course, he refused to do."

As indicated by the record, Phelps Aero, Inc., continued to use the North Central plane until September 7, 1962, when North Central terminated the lease for nonpayment of the rentals due by its terms. It will be noted that in the interval between the June 1962 conversation between Phelps and Sanborn and the date of termination, plaintiff had, on July 24, 1962, and again on August 31, 1962, permitted the use of its plane by Hartzell.

Notwithstanding the foregoing evidence which appears in the record

and the inference which may be based upon it, the testimony is undisputed that the use by Hartzell of airplane taxi service available from Phelps was in no way affected or diminished by the circumstance that North Central had made the craft available to it at a charge considerably lower than that customarily and necessarily made by Phelps when it chartered the North Central plane to its customers.

The testimony of Thomas S. Hartzell, president of Hartzell Manufacturing Company, in this regard is uncontradicted and is as follows:

"Q.    If the services of the North Central airplane or the Dow airplane or the Minnesota Bearing plane had not been available on these trips that you took in the North Central or the other airplanes, what would you have then done?

"A.    We would have gone commercial.

"Q.    You would not have chartered?

"A.    No.

"Q.    Why would you not have chartered?

"A.    The high cost of a chartered aircraft for our type of travel is just too expensive. We couldn't afford it.

"Q.    And yet you did charter the Phelps airplane twice in 1961?

"A.    Yes.

"Q.    How do you distinguish your policy there?

"A.    Well, to the best of my knowledge those are the only two instances in the history of our company including up to the present day where we have ever had an assembly line about to· go down and that the only way we could keep it going was by chartering an airplane.

\*    \*    \*    \*    \*

"Q.    Would that have been true even if you couldn't make connections and that extended your trip for a day or two days?

"A.    I don't think that we have ever been in a position where we had not been able to schedule either commercial airlines or be able to borrow a plane that would be satisfactory.

\*    \*    \*    \*    \*

"Q.    Now, if the use of a commercial airline of four or more persons or three or four persons was about the same, or perhaps a little less than the cost of a charter, but it meant that you would have to take an extra

day, would that extra day mean anything to your company in the terms of cost and the value of the time of yourself and your employees?

"A. I could answer that by saying that in the seven years that we have been in business we have never felt it was worth the extra point of chartering an airplane.

"Q. But you did charter the airplane of North Central?

"A. Right. Because we felt that was four or more people there and that was economically sound.

"Q. And did you charter an airplane of Mr. Phelps in 1961 on two occasions?

"A. Right. And as I said, those were just to keep production lines going."

It is our conclusion that the judgment as entered in the trial court must be affirmed. We do not feel that any considerations of public health or safety will be served by denying plaintiff a right of recovery on the March 10, 1961, agreement for failure to obtain a license or certificate even though it be assumed or accepted that a license or certificate of the kind not secured was needed if the plane was to be leased by plaintiff to defendant. If an agreement by plaintiff is to be implied, or an obligation otherwise imposed, restricting plaintiff from making the use of its plane available to persons who would otherwise rent from defendant, the evidence disclosed by the record is inadequate to support a finding that the conduct of the plaintiff in this regard diverted from defendant business which it would otherwise have received.

Affirmed.