CERTIFIED PEST CONTROL COMPANY, INC. & others *vs.* ABRAHAM KUIPER & another.

Norfolk.    January 9, 1973. — March 29, 1973.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Sale,* Sale of stock.    *Contract,* Agreement not to compete.    *Good Will. Unlawful Interference.    Unfair Competition.*

Findings by a master in a suit in equity by a corporation engaged in the pest control business against a former minority stockholder, officer, director and service manager that when the defendant resigned his offices in the plaintiff and severed his connection with it he was given cash and a promissory note by the plaintiff in full payment for his stock, following the plaintiff's rejection of his proposal to take some of the money due him in the form of customer accounts, and that the sale price of the defendant's stock was measured in part by the dollar value of such accounts, justified a conclusion that there was an implied covenant that the defendant would not solicit those customers of the plaintiff who were its customers when he severed his connection, even though the plaintiff expected him to compete and good will was not mentioned in the sale; and this court affirmed a final decree enforcing the covenant and ordering payment of damages by the defendant, who had solicited and obtained former customers of the plaintiff. [202-205]

BILL IN EQUITY filed in the Superior Court on May 1, 1970.

The suit was heard by *Dwyer,* J., on a master's report.

*Herbert D. Lewis* for the defendants.

*Sydney Berkman* for the plaintiffs.

KEVILLE, J.    This is an appeal from a final decree of the Superior Court sitting in equity. The plaintiffs are Aaron and David Fleischer (the Fleischers) and Certified Pest Control Company, Inc. (Certified), now wholly owned by the Fleischers. The defendants are Abraham Kuiper

(Kuiper) and Bram Pest Control, Inc. (Bram), a corporation organized by Kuiper. The decree enjoined the defendants for five years from soliciting customers of Certified who were its customers on March 5, 1970. The decree also ordered that Kuiper pay to Certified the sum of $4,200.

The case was referred to a master whose report after recommittal was confirmed on the plaintiff's motion. No appeal was taken from the allowance of the motion. Of the questions presented upon appeal from the final decree, the defendants do not question the consistency or the correctness of the master's findings; but they contend that the facts found do not support the decree. *Lukas* v. *Leventhal,* 344 Mass. 762. Disregarding paragraphs 26 and 27 of the report, to the inclusion of which the defendants have objected as being conclusions of law and thus beyond the authority of the master *(Sprague* v. *Rust Master Chemical Corp.,* 320 Mass. 668, 677; *O'Brien* v. *Dwight,* 363 Mass. 256, 282) we hold that the facts found with the proper inferences to be drawn therefrom support the decree. *Foot* v. *Bauman,* 333 Mass. 214, 219. *Smigliani* v. *Smigliani,* 358 Mass. 84, 87.

We summarize those facts essential to the purposes of this opinion. Certified is engaged in the pest control business. Before the formation of Certified, Kuiper had been associated with the Fleischers and their father in the Astor Exterminating Company (Astor). In 1962, the Fleischers and Kuiper left Astor and organized Certified. The Fleischers by agreement with Astor took with them a certain number of customer accounts. Astor and Certified each agreed not to solicit the accounts of the other for a period of five years. The master found that in the pest control business, when one company acquires another or some of the accounts of another, the acquisition is always accompanied by a general covenant on both sides not to compete, or a specific covenant by the selling company and its principals not to solicit the transferred accounts for a period of time which is usually five years.

When he had gone to work for Astor, Kuiper had signed a "non-competition" clause in which he agreed not to engage

in a competing business upon leaving the company. While working for Astor, Kuiper had told one of the Fleischers that he would never sign such an agreement again since it effectively prevented him from pursuing his occupation.

When he joined Certified, he bought 166 shares of its stock for $10,000. His shares were about ten percent of the outstanding stock; the Fleischers owned the balance. They made an agreement with Kuiper which required the repurchase of his stock by Certified at the request of either party at a purchase price arrived at by a formula based upon the percentage of stock held by him, "magnified or diminished" in accordance with the total dollar value of customer accounts. All employees of Certified with the exception of Kuiper and the Fleischers signed non-competition agreements. Kuiper refused to sign such an agreement.

In January, 1970, he submitted his resignation and requested that his stock be purchased by Certified under the agreement. The papers were signed on March 5, 1970. Between January and March he had placed advertisements in a pest control magazine seeking another position. On or about March 5, he had informed the Fleischers that he intended to go into the pest control business. The Fleischers expected that he would compete with Certified.

He discussed with the Fleischers the possibility of taking some of the money due him in the form of customer accounts, but the Fleischers rejected that proposal. Pursuant to the agreement, he was given $5,000 in cash and a note for $51,228.08 in full payment for his stock. At the same time he resigned as an officer and director of Certified and severed his connections with the company. From the time Certified was organized in 1962 until the end of January, 1970, he had been an officer, director and service manager of the company. One of his responsibilities was assisting servicemen in dealing with customer problems; and he was in constant contact with many of Certified's customers. At the time he left he knew of approximately 200 customers of Certified, and that they required pest control services. The Fleischers did not expect that he would use his memory of their customers' names to solicit

them. The fair market value of former customer accounts of Certified, solicited and obtained by Bram and known to it as former customers of Certified, was $4,200.

It is the duty of the trial court and of this court to draw its own inferences and to reach its own conclusions from the subsidiary findings of the master. *Corrigan* v. *O'Brien*, 353 Mass. 341, 345-346. *O'Brien* v. *Dwight*, 363 Mass. 256, 281. In our view the master's findings justify the conclusion that there was an implied covenant that Kuiper would not solicit those customers of Certified who were its customers on March 5, 1970, although the Fleischers, subject to that limitation, expected that he would be a competitor.

The existence and scope of an implied covenant not to compete depend upon the circumstances attending the contract of sale and the nature of the business or the interest which is sold. *Hoxie* v. *Chaney*, 143 Mass. 592, 594, 595-597. Levin, Non-Competition Covenants in New England, 39 B. U. L. Rev. 482, 500-502.

"[W]here the sale agreement omits to mention good will in the transfer of a business, it is presumed that the good will passes with the other assets." *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 568. An agreement is implied that the seller will not compete with the purchaser to derogate from the value of that which has been sold. *Lynn Tucker Sales, Inc.* v. *LeBlanc*, 323 Mass. 721. The obligation of a seller not to interfere with the good will of a business sold by him has been described as one to refrain from using "the opportunities and influences which had built . . . [the business] up to impair it." *Munsey* v. *Butterfield*, 133 Mass. 492, 495.

In *Tobin* v. *Cody,* 343 Mass. 716, 721, it was stated that, "[w]hile it may be true that the good will of the business belongs to the corporation as an entity and not to the stockholders as such, the value of the good will is reflected in the value of the stock which was the subject of the sale. Where, therefore, the sellers of the stock have been active participants in the business and are in a position to control or affect its good will, we think not only that they. may validly bind themselves by an express promise not to

derogate from the good will reflected in the value of the stock sold by competing with the buyers remaining in the business, but also that *in appropriate circumstances* such a promise can be implied in the sale of the stock itself" (emphasis supplied). See *Cap's Auto Parts, Inc.* v. *Caproni*, 347 Mass. 211, 215.

We think that the instant case is governed by the rationale of *Tobin* v. *Cody, supra*. The facts in that case are similar in many respects to those under consideration. There, as here, good will was not mentioned in the sale. The sellers, who were substantial shareholders, sold all of the stock held by them; they relinquished their offices in the corporation, and completely severed their connection with it. For several years they had been importantly identified with the company. Kuiper, particularly, because of his knowledge and acquaintance with its customers was in a position to affect the good will of the company. In each case the buyers reasonably expected that they were purchasing all of the seller's interest in the corporation.

Customer accounts, obviously an important asset of this corporation, were a form of Certified's good will. That a promise not to solicit its customers was implied in the sale of Kuiper's stock is punctuated by two facts found by the master, viz. the sale price for his shares was determined under a formula measured in part by the dollar value of customer accounts, and Kuiper's proposal, which was rejected by the Fleischers, to take customer accounts in lieu of some of the money due him under the sale. These findings indicate that he was surrendering his interest in the accounts, and that Certified was not disposed to sell them. He should not now be permitted to take that which he could not buy. No contention is made that the damages ordered to be paid are unreasonable in amount or that the injunction is too broad.

*Decree affirmed.*