HARVEY RADIO LABORATORIES, INC., Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harvey Radio Laboratories, Inc. v. Commissioner
Docket No. 5148-70
United States Tax Court
T.C. Memo 1972-85; 1972 Tax Ct. Memo LEXIS 172; 31 T.C.M. (CCH) 333; T.C.M. (RIA) 72085; April 10, 1972
*172 Petitioner sold all of its broadcasting facilities to Kaiser Broadcasting Corporation pursuant to a Purchase and Sale Agreement, which included covenants not to compete on the part of petitioner, its sole stockholders (the Lymans), and two other entities (controlled by the Lymans) which also sold certain assets related to petitioner's broadcasting operations under the same agreement. The purchaser requested the covenants because of its concern about possible competition. The purchaser and the sellers agreed that $ 60,000 out of the total purchase price of $ 1,750,000 was to be assigned to the covenants, and the $ 60,000 was in turn allocated in the agreement among the sellers and the Lymans, $ 45,000 thereof being allocated to petitioner's covenant. Held, petitioner has not adduced "strong proof" to the effect that its covenant lacked economic significance or that it was not a negotiated provision of the Purchase and Sale Agreement; accordingly, the $ 45,000 must be regarded as having been received by petitioner for its covenant and not in exchange for assets resulting in tax-free gain under section 337, I.R.C. 1954. Chester M. Howe, for the petitioner. A. W. Dickinson, for the *173 respondent. RAUM
DECISION
Pursuant to the determination of the Court, as set forth in its Memorandum Findings of Fact and Opinion, dated April 10, 1972, it is ORDERED and DECIDED: That there is a deficiency in income tax for the year 1966 in the amount of $ 21,600. MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1966 in the amount of $ 21,600. The sole issue for decision is whether an amount received by petitioner in respect of a covenant not to compete provided for in a contract of sale of certain radio and television stations is taxable as ordinary income or is to be treated as capital gain with the consequence that it is relieved of tax by reason of section 337, I.R.C. 1954. FINDINGS OF FACT The parties have filed a stipulation of facts which together with the accompanying exhibits, is incorporated herein by this reference. Petitioner Harvey Radio Laboratories, Inc. ("petitioner," "Harvey Radio" or the "corporation"), was a Massachusetts corporation, and its principal place of business was at Cambridge, Massachusetts. It filed a Federal corporate income tax return for the calendar year 1966 with *174 the district director of internal revenue at Boston, Massachusetts. Petitioner corporation was dissolved in 1967 prior to the filing of the petition in this case, which was filed on its behalf by Austin Broadhurst, who was Harvey Radio's clerk prior to its dissolution. In 1966, and for some years prior thereto, petitioner conducted a radio and television broadcasting business. It held licenses from the Federal Communications Commission ("FCC") to operate both AM and FM radio broadcasting stations (WXHR-AM and WXHR-FM, respectively). Petitioner also held a construction permit from the FCC to construct and initially operate a television station (WXHR-TV, Channel 56) in the ultra high frequency range ("UHF"). A construction permit was merely a provisional grant of authority from the FCC to acquire transmitting facilities and broadcast on a trial basis. However, because such permits allowed their holders to enter the television market and could result in full licensing, they had considerable value. Notwithstanding that such permits or licenses were not transferable as such, they could in effect be sold in the sense that the holder of the permit or license could set his broadcasting *175 facilities subject to the FCC's issuance of a comparable permit or license to the purchaser, and the price paid for the entire package could include a substantial amount attributable to the permit or license. All of the capital stock of Harvey Radio was owned by Frank Lyman ("Lyman") and his wife, Jeanne S. Lyman. Lyman became president and principal stockholder of petitioner around 1941, and through petitioner was instrumental in pioneering and developing various broadcasting facilities. His successful development of petitioner's AM radio station involved a great deal of expertise and knowledge. Through petitioner, Lyman had also been a pioneer of FM radio broadcasting and UHF television transmission in the Boston area. The Lymans also owned more than 90 percent of the capital stock of Cambridge Thermionic Corporation (hereinafter referred to as "Cambion"), another Massachusetts corporation, which was involved in the business of measuring the precise frequencies of broadcasting stations, and was well known in the broadcast field in this respect. In addition to its broadcast interests petitioner also conducted a small, machine business, of which Cambion was the primary customer. *176 Besides their interests in petitioner and Cambion, the Lymans also owned, in the form of transferable shares, all the beneficial interests in the Lyman Real Estate Trust ("Lyman Trust"). Certain real property occupied by petitioner in the conduct of its radio and television business was leased by it from the Lyman Trust. Petitioner was granted its initial UHF television construction permit for Channel 56 in 1952 or 1953. It constructed the necessary transmitting facilities and proceeded to broadcast on a "minimal basis" until around 1954, at which time it ceased television broadcasting. Petitioner had found that it was unable to attract a UHF viewing audience because of the competitive advantages of stations operating in the very high frequency ("VHF") range. Around 1964 petitioner undertook plans to recommence UHF television broadcasting as a result of considerable pressure put on it by the FCC to act in accordance with the construction permit. These plans entailed resuming broadcasting also on a "minimal basis" but with higher power than previously. In this respect petitioner acquired a second-hand television transmitter, constructed a building in Woburn, Massachusetts, to *177 house the transmitter, and conducted some experimental broadcasts in 1964. Because of petitioner's limited ability to make capital investments, a television camera and certain other equipment necessary to recommence broadcasting were purchased by Cambion with the understanding that such equipment would be leased to petitioner when it resumed operation. In 1965, while it was involved in these plans to recommence UHF television transmission, petitioner was approached by James T. Lynegh, a representative of Kaiser Broadcasting Corporation ("Kaiser"), who inquired about the possibilities of Kaiser's acquisition of petitioner's radio and television business and the assets related thereto. Kaiser was a Nevada corporation and an experienced operator of both television and radio stations in other cities. It was interested in entering the Boston UHF television market and had made extensive investigations in this respect. When it began negotiations with the petitioner Kaiser was principally interested in acquiring petitioner's UHF television facilities and a "transfer" of the construction permit issued by the FCC. Its interest in petitioner's AM and FM radio broadcasting stations was incidental *178 to this primary concern. Because the proposed purchase of the radio and television stations by Kaiser was to involve all of the properties related to Harvey Radio's broadcasting operation, and such assets were owned variously by Cambion, the Lyman Trust, and by petitioner itself (hereinafter referred to collectively as the "sellers"), as described hereinabove, it was necessary that Cambion and the Lymans, in their capacities as trustees of the Lyman Trust, also participate in the negotiations and sale. Similarly, because of the Lymans' ownership interests and control of all three of the sellers, they were also made parties, in their individual capacities, to the negotiations. In the circumstances, however, Kaiser regarded itself as dealing in substance with one seller inasmuch as petitioner, Cambion and the Lyman Trust were all interrelated and controlled by the Lymans. Discussions between the sellers and Kaiser continued until the beginning of April, 1966, when the parties began to negotiate a total price for the sale of the radio and television broadcast assets. At this time petitioner's UHF television facility had not yet resumed transmission and only its AM and FM radio stations *179 were operating. Of the two radio stations, the FM station had lost substantial ground in the market to another FM station with a similar programming format, and the AM radio station was for practical purposes petitioner's only "going business" in the broadcasting field. Participating in the ensuing negotiations with Kaiser on behalf of the sellers were Lyman, an associate of his named Wilkes, and Austin Broadhurst ("Broadhurst"), a partner in the Boston law firm of Ely, Bartlett, Brown and Proctor, who was also a director and clerk of the petitioner. The Ely, Bartlett, Brown and Proctor law firm represented petitioner, and Broadhurst was the partner in the firm who generally acted as petitioner's legal counsel. Negotiations on behalf of Kaiser were conducted principally by Richard C. Block ("Block"), its vice-president and general manager. He was assisted by several other persons including Kenneth M. Robinson ("Robinson"), Kaiser's house counsel; legal counsel in Washington, D. C., for FCC matters; and Joseph H. B. Edwards ("Edwards") a partner in the Boston law firm of Bingham, Dana and Gould, which was to handle the matter locally for Kaiser. On April 7, 1966, representatives *180 of the sellers and Kaiser met at Broadhurst's office. Discussion centered on an overall price for the sale of the broadcasting business. The sellers began by asking a price of $ 2 million. Block thought that the business was not worth more than $ 1.5 million, and explained his position with a rough breakdown of the various broadcast assets whereby he assigned a value of $ 1.25 million to petitioner's UHF television construction permit which was the principal asset involved. There was no discussion at this meeting in respect of any proposed agreements on the sellers' or the Lymans' parts not to compete in the broadcasting field after a sale of the radio and television assets. After some negotiation Block suggested that Kaiser's best cash offer was $ 1.6 million. The sellers set a minimum cash price of $ 1.75 million. The parties then considered an alternative arrangement for the sale of petitioner's broadcasting interests which involved an exchange of Harvey Radio Laboratories, Inc., stock for stock of Kaiser Industries, of which Kaiser Broadcasting, Inc., was a subsidiary. Lyman favored this alternative arrangement inasmuch as the Kaiser Industries stock would allow him indirectly *181 to continue his participation in the television business. The conference ended with the parties considering the two alternatives. Ultimately Kaiser decided against a stock for stock exchange, and it was decided that Kaiser would pay $ 1.75 million for all the assets involved in petitioner's broadcasting operations. Pursuant to this understanding in respect of the total purchase price, the Bingham, Dana and Gould law firm drafted a preliminary purchase and sale agreement around May 16, 1966, and sent it to Kaiser for comment. Though Broadhurst was informed of the draft agreement by telephone, he did not receive a copy of any proposed draft until a few days before June 16, 1966, and he was not informed of the details thereof. It was not until the purchase and sale agreement was being drafted that Robinson, who, as mentioned hereinabove, was Kaiser's house counsel, suggested to Block that covenants not to compete be included in the final agreement. In two previous television station acquisitions Kaiser had not asked for such covenants because in each case the principal sellers involved were from other areas and had no active role in local broadcasting. However, in this purchase, *182 Robinson pointed to Lyman's extensive background in broadcasting and to the availability of another UHF television frequency, Channel 68, in the Boston area. Channel 68 had not yet been allocated by the FCC, and Kaiser had, in fact, applied for the frequency and withdrawn its application when it entered into the agreement here in question with petitioner, the other sellers and the Lymans. Kaiser also considered that it was possible for the sellers or the Lymans to merge with the other applicants for Channel 68 and construct a joint, interim operation, or enter into partnership with an existing licensee of another UHF frequency. After some discussion among the Kaiser representatives, they decided to request covenants not to compete from the sellers and the Lymans. Although Block and Kaiser's other representatives were also aware that there were possible tax advantages in allocating part of the purchase price to such covenants not to compete, Kaiser requested the covenants because of its concern about possible competition from the sellers and the Lymans. In this respect also Kaiser regarded the Lymans as inseparable from the entities which they controlled including the petitioner. *183 Block and his associates assigned a total value of $ 60,000 to the covenants not to compete and instructed Edwards to request of Broadhurst that such covenants be included in the final agreement. In arriving at this total value they did not apply any specific standards but merely determined an amount which they considered reasonable in the circumstances. The ensuing discussions which Broadhurst and Edwards had in respect of the covenants pertained principally to the geographical scope of the covenants. Neither the Lymans nor the sellers offered any resistance to including such covenants in the purchase and sale agreement, although Lyman was concerned about the scope of the covenant pertaining to him because he held small stock interests in certain other corporations which owned television stations. Kaiser suggested that the scope of the covenant not to compete be a 50 mile radius from the State House in Boston. Broadhurst negotiated the radius down to 25 miles. At the time of the negotiations in respect of the sale of the radio and television broadcast assets, Lyman contemplated that Harvey Radio would "get out" of the broadcast field because he considered the corporation unable *184 to raise sufficient financing necessary to compete in UHF television. At this time it was also contemplated that petitioner would eventually be liquidated, and at least Edwards was informed of this possibility in connection with the need for arranging an alternative method to carry out the sale transaction if the corporation was no longer in existence. Kaiser apparently was not fully informed of petitioner's financial position or its economic ability to re-enter the Boston UHF market. And although Kaiser was thus notified of the possible liquidation of petitioner after the sale of its broadcast assets, Kaiser's representatives determined that a formal covenant not to compete was desirable for Kaiser's protection and should be included in the purchase and sale agreement in the event such liquidation never occurred. When Broadhurst finally received a copy of the proposed purchase and sale agreement a few days before June 16, 1966, it contained the covenants not to compete, and the total price therefor was fixed in the proposed agreement at $ 60,000. There were blank spaces beside the names of the Lymans, Cambion and petitioner for an allocation of the $ 60,000 among them. In a conversation *185 with Edwards, Broadhurst suggested the allocation of the $ 60,000 that was eventually incorporated into the final Purchase and Sale Agreement, as hereinafter set forth, and under which $ 45,000 was allocated to Harvey Radio's covenant not to compete, $ 5,000 to the Lymans' covenant, and $ 10,000 to Cambion's covenant. The precise allocation of the $ 60,000 among the Lymans, Cambion and petitioner was not a matter of consequence to Kaiser; it was concerned primarily that each of the covenants be supported by consideration and be legally enforceable. Broadhurst did not discuss the contents of the proposed agreement with anyone in his law firm who was a tax specialist, although he was aware that the amounts received in respect of the covenants not to compete could possibly constitute ordinary income to petitioner as well as to Cambion and the Lymans. It was Broadhurst's view, however, that insofar as petitioner was concerned the covenant would have "no meaning as a tax matter". On June 13, 1966, shortly before the Purchase and Sale Agreement was executed, the parties to the agreement held another conference at which they discussed the allocation of the total purchase price of $ 1.75 *186 million among the assets to be sold. Since the entire agreement was to be contingent upon FCC approval of the "transfer" of petitioner's television construction permit and radio licenses, it was of some concern to the sellers and to Kaiser that the allocation should be favorably received by the FCC. In this respect Kaiser's Washington, D. C., counsel for FCC matters advised Block that the amount of intangible assets involved in the sale would not be "repugnant" to the FCC, which had a policy against selling or "trafficking" in bare construction permits for more than out-of-pocket costs. At the June 13, 1966, conference the covenants not to compete were ultimately assigned a value of $ 60,000, the amount Block and his associates had originally suggested. The late introduction of the covenants into the agreement did not result in an increase in the total consideration to be paid by Kaiser since the sellers and Kaiser had agreed on the total cash price of $ 1.75 million and both sides understood that details like those involving the covenants would be resolved thereafter. Broadhurst's contemporaneous notes of the meeting of June 13, 1966, also disclosed that an item labeled "Good *187 will" was assigned a value of $ 930,000. Kaiser, however, did not consider good will to be an important element of the purchase since, for practical purposes, Harvey Radio's only "going business" was its AM radio station and Kaiser did not regard the good will relating thereto as being of any substantial consequence. And in this connection, after acquiring the broadcast assets, Kaiser changed the call signs of both the AM and FM radio stations and the UHF television station. The $ 930,000 amount was apparently attributable, at least in major part, to petitioner's television construction permit, and the record does not disclose any definite agreement among the parties as to the value assigned to this item. At a special meeting of the board of directors of Harvey Radio on June 16, 1966, a resolution was adopted authorizing the sale of petitioner's broadcast assets to Kaiser pursuant to the proposed purchase and sale agreement, which, along with certain amendments thereto, was presented at the meeting. One such amendment related to Section P-1 of the final agreement which dealt with the covenants not to compete, but the record does not disclose the nature of this amendment. In accordance *188 with the resolution and also on June 16, 1966, petitioner, together with Cambion and the Lymans, acting both as trustees of the Lyman Trust and individually, executed the Purchase and Sale Agreement with Kaiser. The Purchase and Sale Agreement provided in part as follows: PURCHASE AND SALE AGREEMENT
Kaiser Broadcasting Corporation ("Kaiser") a Nevada corporation has agreed to acquire from the several Sellers, hereinafter identified, and said Sellers have agreed to transfer, deliver and assign to Kaiser on the Closing Date, as hereinafter defined, all of the assets and properties owned by them which are now used or useful in the operation and construction of the radio and television stations located in the Greater Boston, Massachusetts area which are known respectively as WXHR-AM, WXHR-FM and WXHR-TV (Channel 56) together with the business of operating said stations. The said agreement is upon the terms and is subject to the conditions hereinafter set forth. ARTICLE A
The Parties
* * * Section A-5: Said Frank Lyman and Jeanne S. Lyman (the "Lymans") hold, beneficially and of record, severally or jointly, all of the outstanding capital stock of Harvey [Radio], more than 90% of the *189 outstanding capital stock of Cambion, and all of the beneficial interests in the Lyman Trust, and Frank Lyman controls Cambion, Harvey [Radio] and the Lyman Trust by virtue of his status as an officer, director or trustee thereof, as the case may be, coupled with the status of the Lymans as holders and owners of the beneficial interest therein as recited above. The Lymans are parties to this agreement to the extent and with the effects provided for in Article P and R hereof. * * * ARTICLE L
Allocation of Purchase Price
and Payment of Balance Thereof
Section L-1:Kaiser is to pay the Lyman Trust $ 10,000 at the Closing representing payment in full for the conveyance of the land described in Section B-1(b). Kaiser is to pay Cambion $ 26,200 at the Closing representing payment in full for the property described in Section B-1(c). Kaiser is to pay the Lymans, Cambion and Harvey [Radio] $ 60,000 at the Closing ($ 5,000 to the Lymans, $ 10,000 to Cambion, and $ 45,000 to Harvey [Radio]) as consideration in full for their covenants in Section P-1 contained. Kaiser is to pay Harvey [Radio] $ 487,134 at the Closing as a first installment of the price to be paid to Harvey [Radio] for the *190 transfers of the balance of the properties described in Article B. The balance of said purchase price shall be paid as provided in Section L-2. Section L-2: The balance of the purchase price payable after the Closing shall be paid by Kaiser to Harvey [Radio] in two equal installments of $ 583,333.00 each the first such installment to be paid three months after the Closing with interest thereon at the rate of 6% per annum from the Closing Date to the date of payment and the second and final installment to be paid six months after the Closing with interest thereon also at 6% per annum from the Closing Date to the date of payment. * * * ARTICLE M
Survival of Warranties
Indemnity Agreement of Sellers
* * * Section M-2: The Sellers jointly and severally covenant and agree that they will indemnify and save Kaiser harmless from any loss or damage arising out of or in any way connected with any breach of any representation or warranty hereunder or any failure to keep any agreement or comply with any covenant hereunder. * * * ARTICLE P
Non Competition
Section P-1: Sellers jointly and severally covenant and agree that for a period of 10 years after the Closing they will not directly or indirectly *191 engage in any radio broadcasting or telecasting business operating through a transmitting antenna located within a twenty-five (25) mile radius from the State House in Boston and without limiting the generality of the foregoing they will not serve as representative, consultant, agent, employee, officer or director of any person, firm, trust or corporation engaged in such period in any such business nor will they have any beneficial interest through stock ownership or the holding of any investment security issued by or evidence of indebtedness of any such person, firm, trust or corporation, but this covenant shall not preclude investment in any security listed on a national securities exchange or actively traded in the over-the-counter market. * * * ARTICLE R
Undertakings by the Lymans
Section R-1: Frank Lyman as an inducement to Kaiser to enter into and perform this Agreement hereby warrants and represents that all facts herein represented and warranted by the Sellers are true and correct in all material respects and covenants and agrees that each Seller will comply with and fully and timely perform all of its obligations hereunder and does hereby guarantee to Kaiser the due fulfillment *192 of all such obligations. Section R-2: The Lymans being the holders beneficially and of record of all of the outstanding capital stock of Harvey [Radio] hereby as such stockholders irrevocably authorize the transfer and sale by Harvey [Radio] of its assets as herein contemplated. * * * ARTICLE V
Choice of Law
Entire Agreement
Section V-1: This Agreement is to be executed and performed in the Commonwealth of Massachusetts and it shall be deemed a Massachusetts contract and shall be interpreted and governed by the laws thereof. Section V-2: All prior agreements written or oral between the parties relevant to the transactions herein contemplated are hereby superseded and this Agreement constitutes the entire understanding and agreements of the parties. When it entered into this agreement Kaiser anticipated that it would incur substantial losses in excess of $ 1 million in each of the first two or three years of its operation of the UHF television station. Its annual losses, however, persisted longer than Kaiser originally anticipated, and it also purchased broadcast equipment in the amount of $ 1.5 to $ 2 million in addition thereto. Such losses and equipment purchases were related *193 to Kaiser's desire to have a "first class operation", and would not necessarily have resulted from a UHF television station of more limited scope. At a special meeting of the stockholders of Harvey Radio on October 20, 1966, the petitioner's shareholders ratified the Purchase and Sale Agreement of June 16, 1966, and adopted a plan for the complete liquidation of the corporation, distribution of its assets to the stockholders, or to a trustee for their benefit, within one year, and its formal dissolution. Accordingly, on November 1, 1966, Harvey Radio filed with the Internal Revenue Service an information return, Form 966, in respect of its plans of complete liquidation and dissolution. Also on November 1, 1966, at a special meeting of petitioner's board of directors, Lyman, as president, reported that the FCC had issued an order permitting the "assignment" of the corporation's radio licenses and television construction permit to WKBC, Inc., which was an affiliate of Kaiser and to which Kaiser had assigned its rights under the Purchase and Sale Agreement. The board of directors thereupon adopted resolutions authorizing the closing of the sale of the broadcast assets to WKBC, Inc., *194 pursuant to the terms of the Purchase and Sale Agreement. Such closing occurred also on November 1, 1966, and petitioner received the balance of the purchase price contemplated by the Purchase and Sale Agreement during the calendar year 1967. On December 16, 1966, petitioner's board of directors at a special meeting authorized the sale of the corporation's machine business to Cambion in accordance with petitioner's plan of complete liquidation. Since all the tangible property of the corporation would be thereby disposed of, the board of directors also directed that the proceeds of the liquidation of the assets of the corporation be distributed to the shareholders after payment of all outstanding corporate liabilities. Petitioner's Federal corporate income tax return for the calendar year 1966 reflected the sale of its broadcasting assets and specifically disclosed that $ 45,000 had been received for a covenant not to compete. However, petitioner treated this amount along with the gain from the sale as non-taxable to it under section 337, I.R.C. 1954. On June 28, 1967, at a special meeting, the stockholders of Harvey Radio voted to dissolve the corporation. All of petitioner's assets *195 were distributed to its shareholders by July 3, 1967, at which time the corporation filed a "Final Return" for the period January 1, 1967, through June 30, 1967. In his deficiency notice to petitioner, the Commissioner determined that the "$ 45,000 received for a covenant not to compete is includible in gross income and it does not qualify for the nonrecognition provided in Section 337 of the Internal Revenue Code of 1954 * * *". OPINION RAUM, Judge: Under the terms of the Purchase and Sale Agreement $ 45,000 was specifically allocated to a covenant not to compete on the part of Harvey Radio. The petitioner contends that the covenant was, in reality, an inseparable element of the good will acquired by Kaiser as a part of the purchase of petitioner's broadcast assets, and that it otherwise lacked any independent basis in fact. As such petitioner argues that the $ 45,000 received by it was capital gain from the sale of "property" and therefore subject to the nonrecognition provisions of section 337, I.R.C. 1954. The Commissioner, on the other hand, maintains that petitioner has not adduced sufficient proof to contradict the terms of the Purchase and Sale Agreement which allocated *196 the $ 45,000 specifically to the covenant. According to the Commissioner, that amount therefore constitutes ordinary income which is taxable to the corporation. The Commissioner once again urges us in deciding this issue to adopt the standard of proof set forth in Commissioner v. Danielson,378 F. 2d 771, 775 (C.A. 3), vacating and remanding 44 T.C. 549, to the effect that the taxpayer may not take a position contrary to the language of the Purchase and Sale Agreement in the absence of such proof as would enable it to have the agreement set aside or modified (i.e., fraud, duress, undue influence, mistake, etc.). Danielson defines the rule followed in the Third Circuit, and we have stated that we will likewise follow Danielson in cases arising in that Circuit under the compulsion of Jack E. Golsen,54 T.C. 742, affirmed 445 F. 2d 985 (C.A. 10), certiorari denied, 404 U.S. 940. See Meyer Mittleman,56 T.C. 717, 175. However, where not so compelled, this Court has followed the rule approved in other circuits by adopting the less extreme, but nonetheless rigorous, standard of proof to the effect that if a taxpayer presents "strong proof", he may take a position contrary to the language *197 in the agreement under question to which he was a party. J. Leonard Schmitz,51 T.C. 306, 315-318, on appeal (C.A. 9, Mar. 18, 1969). See Balthrope v. Commissioner,356 F. 2d 28, 31-33 (C.A. 5), affirming a Memorandum Opinion of this Court; Montesi v. Commissioner,340 F. 2d 97, 100 (C.A. 6), affirming 40 T.C. 511, 518; Barran v. Commissioner,334 F. 2d 58, 63-64 (C.A. 5), affirming on this issue 39 T.C. 515; Schulz v. Commissioner,294 F. 2d 52, 55 (C.A. 9), affirming 34 T.C. 235; Ullman v. Commissioner,264 F. 2d 305, 308 (C.A. 2), affirming 29 T.C. 129; Edmond E. Maseeh,52 T.C. 18, 22. We have recently reiterated our adherence to this so-called "strong-proof" rule (see Meyer Mittleman, supra, 56 T.C. at 175), and decline the Commissioner's renewed invitation to reconsider this position and to adopt the Third Circuit's more extreme rule of the Danielson case. [1] *198 *199 The "strong-proof" doctrine requires a determination of whether the covenant in issue had an independent economic significance in the Purchase and Sale Agreement such that we might conclude it was a separately bargained for element thereof. See Schulz v. Commissioner, supra,294 F. 2d at 55 (C.A. 9), affirming 34 T.C. 235; Henry P. Wager,52 T.C. 416, 419; Edmond E. Maseeh, supra,52 T.C. at 22. Cf. Balthrope v. Commissioner, supra,356 F. 2d at 32-34 (C.A. 5), affirming a Memorandum Opinion of this Court; John T. Dodson,52 T.C. 544, 555-556; Benjamin Levinson,45 T.C. 380, 389-390. In applying this test to the case before us, we think the covenant not to compete was of definite economic significance and that it was a negotiated provision of the agreement. The petitioner, in any case, has certainly failed to adduce "strong proof" to the contrary. When Kaiser first decided to request the various covenants not to compete, it was aware of both Lyman's and petitioner's experience in the broadcast field and the available opportunities open to them for a reventure into the Boston UHF television market. [2] *202 Since Lyman had developed *200 his reputation in broadcasting through the development of Harvey Radio's various radio and television facilities, Kaiser reasonably regarded Lyman and the corporation as inseparable in this respect. And indeed, when the parties to the sale were considering a stock for stock exchange as a means of effecting the transaction, Lyman had evinced some interest in continuing his participation in television broadcasting. In the circumstances, we think the various covenants not to compete were of "significant value" to Kaiser. See Montesi v. Commissioner, supra,340 F. 2d at 99 (C.A. 6), affirming 40 T.C. 511. Cf. Edmond E. Maseeh, supra,52 T.C. at 23. Although informed that Lyman considered eventually liquidating Harvey Radio, Kaiser for its own protection still insisted on including formal covenants in the Purchase and Sale Agreement in respect of all the sellers in case such liquidation did not occur. Certainly, petitioner has failed to establish by strong proof or otherwise, that the $ 60,000 aggregate consideration for all the covenants demanded by Kaiser was unreasonable. And since Kaiser was concerned in this connection merely that each covenant be supported by consideration so *201 that it would be enforceable, it was a matter of but very little consequence to it how that $ 60,000 would be divided among the sellers. Accordingly, the allocation of the $ 60,000 was left entirely up to the sellers and the Lymans. While we have some doubt that the $ 45,000 allocated to petitioner, in contrast to the $ 5,000 allocated to the Lymans, was realistic, that allocation was not only made by counsel for the sellers and the Lymans on their behalf, but was approved by petitioner itself, and it may not now be heard to complain that the $ 45,000 actually paid to it by the purchaser for its covenant not to compete was in fact intended as consideration for something else. [3] *203 Moreover, petitioner's counsel was aware that the $ 45,000 received by petitioner in respect of the covenant not to compete could represent ordinary income. Yet, though negotiations were conducted as to the geographical scope of the various covenants, neither petitioner nor its counsel on its behalf objected to the inclusion of the covenant itself in the agreement of sale. Petitioner's counsel merely accepted the $ 60,000 figure which Kaiser had determined to be a reasonable allocation in respect of the various covenants not to compete, and -- acting for the petitioner and the other sellers, all of which were interrelated by virtue of the Lyman's ownership and control -- specifically allocated a portion thereof (the $ 45,000 in issue) to the covenant not to compete on the part of Harvey Radio. Also, the minutes of petitioner's board of directors meeting of June 16, 1966, disclose that the board not only approved the Purchase and Sale Agreement but considered an amendment to Section P-1 thereof which dealt with the covenant not to *204 compete. Surely, in the circumstances, petitioner cannot be heard to say, if it were otherwise relevant here, that it did not consider the consequences of the covenant pertaining to it, or that it did not fully comprehend the significance thereof. Cf. Hamlin's Trust v. Commissioner,209 F. 2d 761, 765 (C.A. 10), affirming 19 T.C. 718; Benjamin Levinson, supra,45 T.C. at 390-391. We regard it as a matter of little consequence that Kaiser and the sellers first tentatively agreed on a total purchase price without specific consideration of any covenants not to compete, and that such covenants were included thereafter in the agreement without a consequent adjustment in the total contract price. The parties understood that the agreement was not "crystallized" and that such provisions might be made after the initial determination of the purchase price. See Edmond E. Maseeh, supra,52 T.C. at 21. Cf. Grant T. Rudie, 49 T.C. 131, 139. The petitioner, however, argues that the covenant in issue was nonseverable from the good will which passed to Kaiser as part of the sale of Harvey Radio's entire broadcast operation, and that therefore the covenant must be accorded identical tax treatment *205 as the transfer of the good will itself. See Aaron Michaels,12 T.C. 17, 19; Toledo Newspapers Co.,2 T.C. 794, 806. [4] In this respect the petitioner contends that as a matter of Massachusetts law a covenant not to compete is an inextricable and nonseverable element of the good will which is presumed to pass as a consequence of the sale of all the assets of a business. According to the petitioner, since the covenant not to compete would have been implied, in any event, as a matter of Massachusetts law, the express provision for the covenant in the Purchase and Sale Agreement had no independent significance and the consideration allocated to it no reasonable basis in fact. We disagree. In the two Massachusetts cases relied upon by the petitioner, the Supreme Judicial Court merely concluded from the surrounding circumstances (including the necessity of protecting *206 good will which the court presumed passed in the sale of the business interests involved) that the respective covenants not to compete were impliedly intended by the parties although no express provision was made therefor. Tobin v. Cody,343 Mass. 716, 720-721, 722, 1800 N.E. 2d 652, 655-656, 657; Cap's Auto Parts, Inc. v. Caproni,347 Mass. 211, 214-216, 196 N.E. 2d 874, 875-876. However, if the parties to the contract of sale were to rely solely upon an implied covenant, it would be necessary to make findings as to its terms, e.g., the precise geographical area involve, the length of time covered by the covenant, etc. [5] *207 Accordingly, under Massachusetts law, where express provision is made for a covenant not to compete, as is the situation in the case before us, there is no room or necessity to imply such a covenant, and the parties to the agreement are to be held to the terms of the covenant which they specifically adopted. Horvitz v. Zalkind,332 Mass. 125, 128, 123 N.E. 2d 382, 384. In the circumstances, the covenant before us had real substance and significance, and we regard without merit petitioner's argument based on Massachusetts law as to implied covenants. In any case, where the good will of a business is presumed to pass as a part of the sale of all the assets of a business, the "existence and scope" of any covenant, which is implied as a part thereof to prevent derogation of such good will, depend on the "circumstances attending the contract of sale and the nature of the business or the interest which is sold". Tobin v. Cody, supra,343 Mass. at 720, 721-722, 180 N.E. 2d at 655, 656 (emphasis supplied). See Horvitz v. Zalkind, supra,332 Mass. at 128, 123 N.E. 2d at 384; Martin v. Jablonski,253 Mass. 451, 456, 149 N.E. 156, 158; Old Corner Book Store v. Upham,194 Mass. 101, 105, 80 N.E. 228, 230. In the case before us, it is clear that the principal assets involved in the sale were petitioner's UHF television construction permit, which Kaiser initially valued at $ 1.25 million, and the facilities related thereto. Whatever good will was involved in the transaction was not related to this inoperative television station or to petitioner's faltering *208 FM radio station, but merely pertained to petitioner's AM radio operation which was Harvey Radio's sole viable broadcast enterprise in 1966. Kaiser requested the covenants not to compete in order to prevent the various sellers, including the petitioner, and the Lymans from entering the Boston UHF television market, and not to protect the minimal amount of good will which the purchaser acquired in respect of the AM radio station. As such, the covenant which it obtained from petitioner had an economic significance quite distinct from any good will which was a part of the sale. Decision will be entered for the respondent.
Footnotes
1. In support of his reliance on Danielson, the Commissioner appears to present an argument to the effect that the Danielson case merely articulates and defines the requisite elements of "strong proof", and that therefore the two tests are, in reality, one. But the question to be resolved in applying the "strong-proof" doctrine is whether the covenant not to compete had "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner,294 F. 2d 52, 55 (C.A. 9), affirming 34 T.C. 235. The Third Circuit in Danielson made it quite clear that it was prepared to hold that the taxpayer in that case could not contradict the language of the pertinent agreement "absent a showing of fraud, undue influence and the like on the part of the other party, * * * even though the evidence * * * would support a finding that the explicit allocation had no independent basis in fact or arguable relationship with business reality". 378 F. 2d 771, 777 (C.A. 3) [emphasis supplied]. Moreover, there are situations in which a taxpayer was permitted by "strong proof" to contradict the terms of an agreement to which he was a party, where it is not readily apparent that he could have proven fraud, duress, undue influence or mistake. See, e.g., Schulz v. Commissioner, supra,294 F. 2d 52 (C.A. 9), affirming 34 T.C. 235; J. Leonard Schmitz,51 T.C. 306, on appeal (C.A. 9, Mar. 18, 1969). Cf. Pumi-Blok Company,T.C. Memo. 1972-48↩,     T.C.M.    . 2. Petitioner has argued that it would not have been economically feasible for it to reenter the Boston UHF television market, and that therefore the covenant on its part not to do so lacked substance. In this respect, Kaiser was apparently not fully informed as to petitioner's financial capabilities to become a competitor. Moreover, though Kaiser expended considerable amounts in the development of Channel 56, it is clear on the record that the magnitude of its costs were to a large extent related to a desire to have a "first class operation". Also, there were several possible means of entry into the UHF television market open to petitioner -- e.g., merging with other applicants for FCC licenses or entering into a partnership with an existing licensee -- which were of concern to Kaiser and which would not necessarily have demanded an investment of the same order of magnitude. Finally, the possibility that re-entry into the broadcasting field might have been financed to a substantial degree through borrowing or otherwise was a possibility that a prudent purchaser would not have ignored, and, surely, careful counsel for the purchaser would have sought protection against all such contingencies in the circumstances. 3. It is not difficult to see why counsel for the sellers and the Lymans wished to allocate as little as possible to the Lymans and as much as possible to petitioner. The amount ascribed to the Lymans would plainly be taxable as ordinary income to them, while there was the hope that the amount attributed to petitioner could somehow or other be treated as part consideration for the sale of assets which might be entirely tax free under section 337. The fact is, however, that petitioner did receive $ 45,000 for its covenant as a result of the allocation which it approved; that amount did not represent consideration for anything else. 4. We note that the soundness of the "severability" test has been questioned. Balthrope v. Commissioner,356 F. 2d 28, 31 (C.A. 5), affirming a Memorandum Opinion of this Court. See Schulz v. Commissioner,294 F. 2d 52, 55-56 (C.A. 9), affirming 34 T.C. 235↩; 3B Mertens, Law of Federal Income Taxation, Sec. 22.33, at 219. 5. Indeed, in Tobin v. Cody,343 Mass. 716, 724, 180 N.E. 2d 652, 658, the Supreme Judicial Court remanded the case to the Superior Court for the specific purpose of determining a reasonable geographical scope to the covenant not to compete which was implied.