**In the Matter of ATLAS FOUNDRY COMPANY, a Corporation of New Jersey, Bankrupt.**

**No. B-90-55.**

United States District Court
D. New Jersey.

Oct. 17, 1957.

McGlynn, Stein & McGlynn, Newark, N. J., by Edward R. McGlynn, Newark, N. J., for Meyer Bornstein, Sarah Bornstein and Anne B. Abrams Sobel.

Andrew B. Crummy, Newark, N. J., Special Counsel for Trustee.

WORTENDYKE, District Judge.

Holders of a mortgage, dated January 22, 1953, upon the plant real estate of the bankrupt corporation, have petitioned this Court, pursuant to 11 U.S.C.A. § 67, sub. c, for review of an order, dated May 8, 1957, made by the Referee and adjudging the mortgage invalid against bankrupt's Trustee. The following questions are presented by the Referee's Certificate of Review:

1. May stockholders of a corporation, through use of a fictitious consideration, obtain a mortgage on the realty of the corporation as part consideration for the sale of their shares of stock in the corporation?

2. In a subsequent Chapter XI, 11 U.S.C.A. § 701 et seq., proceeding involving the corporation, does the execution of an extension agreement regarding the mortgage estop the present Trustee in bankruptcy from questioning the validity of the mortgage?

So much of the factual background as appears established in the record, and was found by the Referee, may be set forth in the language of the Referee's said Certificate as follows:

"(1) Meyer Bornstein was the stockholder of Atlas Foundry Company to whom all the other stockholders left the complete management of affairs. Sydney Gutkin, Esquire was the lawyer in whom all the stockholders had an implicit confidence in the handling of all legal transactions. M. Raymond Riley was the person who brought together Meyer Bornstein and Messrs. Goldinger and Ehrlich of the C. A. Goldsmith Company.

"(2) Messrs. Riley, Bornstein, Goldinger and Ehrlich met together at the plant of Atlas Foundry Company in November, 1952 and it was tentatively decided that the Bornsteins would sell all the stock of Atlas to Messrs. Ehrlich and Goldinger, but the complete agreement was not made until a meeting in late December of 1952. This later meeting had its humorous aspects—Mr. Bornstein told Messrs. Ehrlich and Goldinger that on the basis of a Dun & Bradstreet report he knew C. A. Goldsmith Company had no money, but they laughed and told him that on the basis of a Dun & Bradstreet report they knew Atlas Foundry Company had money. Mr. Bornstein told them he would help them procure a loan to swing the transaction and referred them to Mr. Gutkin for what help they needed in meeting the $650,000.00 figure which had been agreed on as the sale price of the Atlas stock.

"(3) Based on the value of the Atlas property and business, Messrs. Ehrlich and Goldinger were able to get a commitment to Goldsmith from a New York factor for $400,000.00; and at the request of Mr. Gutkin, Mr. Raymond Riley, in his capacity of Vice-President of National State Bank, promised interim financing of $250,000.00. These arrangements made, all parties met at the office of Sydney Gutkin on January 22, 1953.

"(4) Immediately prior to this meeting on January 22nd, Goldsmith's bank balance in the National State Bank was $12,911.27 and Atlas's bank balance was $284,390.67; and Atlas had no need for additional cash in the operation of the business.

"(5) At the meeting on January 22nd, the sequence of events so far as they relate to the mortgage in question was as follows: Mr. Riley held a credit memorandum that the Goldsmith account in the National State Bank had been credited with

$250,000.00; Goldsmith made a loan of $250,000.00 to Atlas and received back a note for this amount and the mortgage in question which covered the Atlas plant in Newark; the Bornstein family sold their shares of stock in Atlas to (Goldsmith, which was controlled by) Messrs. Ehrlich and Goldinger in return for $400,000.00 in certified checks produced by Goldsmith's New York factor and a note of Goldsmith for $250,000.00 secured by the note and mortgage from Atlas to Goldsmith which was then assigned to the Bornstein interests.

"(6) As part and parcel of the above transaction, Messrs. Ehrlich and Goldinger, as the new stockholders and directors of Atlas, immediately reduced the bank balance of Atlas to $25,587.08 by full repayment to Goldsmith of the $250,000.-00 so that the National State Bank could be repaid, and by partial repayment to the New York factor and his associates in the deal who had advanced the $400,000.00.

"(7) The simultaneous transactions on January 22nd, 1953 so burdened Atlas with debts and so weakened its cash position that some form of insolvency proceeding became inevitable and on December 23, 1953 it filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. During the course of the Chapter XI proceeding the Bornsteins and the officers of Atlas entered into an extension agreement with respect to the mortgage in question.

"(8) Atlas was unable to put forward an acceptable plan in the Chapter XI proceeding. An adjudication in bankruptcy followed. The real estate subject to the mortgage was sold by the trustee in bankruptcy free of liens; liens, if valid, to attach to the proceeds of sale."

 The Referee correctly concluded that the mortgage in question is in-

valid against the Trustee of the bankrupt because its execution by the bankrupt and acquisition by the present holders was achieved with the knowledge and collusive cooperation of such holders by way of circumvention of the legal obstacle prohibiting the bankrupt from mortgaging its assets to pay its stockholders for their stock.

Counsel for the mortgagees (hereinafter referred to as the Bornsteins) concede that the bankrupt could not make a valid mortgage direct to the Bornsteins as part of the consideration for the sale of their stock in the bankrupt corporation. At page 5 of the Bornsteins' brief we read:

"Everyone connected with the transaction knew, and there is no dispute, that legally Atlas Foundry Company, as a corporation, could not make a valid mortgage direct to the members of the Bornstein family as part of the sales price of their stock in Atlas Foundry Company which was owned by them personally and being sold to C. A. Goldsmith Company."

It is also conceded that the execution and delivery of the mortgage here in question, which I characterize as but one of a group of simultaneous and related transactions, terminated in the reduction of the free assets of the bankrupt corporation to a point too low to permit it to carry on its operations with safety. Mr. Meyer Bornstein, who participated from the outset in the negotiations which resulted in the stock sale, testified that the Atlas business was of such a type that it required cash capital of between $200,000 and $300,000 to operate. (Tr. May 4, 1955, p. 24.) The end result was a necessary consequence of the successful efforts of the attorney who represented the sellers of the stock to raise a portion of the price which they demanded by placing a mortgage upon the plant real estate of the bankrupt corporation and of the reduction of the assets of Atlas to so low a point that Atlas became insolvent and, on December 23, 1953, less than one year after these transactions were accom-

plished, filed its petition for an arrangement under Chapter XI of the Bankruptcy Act.

The so-called loan from Goldsmith to Atlas was actually of no benefit to Atlas whatsoever. Simultaneously with the deposit of the money in the bank account of Atlas, Ehrlich and Goldinger, owning all of the stock of Goldsmith, the purchaser corporation, caused Atlas to repay to Goldsmith the $250,000 which had been ostensibly loaned by the latter to the former, and further reduced the bank account of Atlas from $284,390.67 to $25,-587.08 by withdrawing and repaying to the New York factors a substantial sum on account of the $400,000 which they had advanced toward the aggregate of the purchase price. Although the bankrupt's insolvency did not occur until after the mortgage was executed, delivered and assigned, the obligation of the mortgage was fraudulent as to existing creditors and as to other persons who became creditors during the subsequent continuance of the business of the corporation because (a) the ostensible consideration which Atlas received was not a "fair" consideration; and (b) the end result of the transactions, of which that involving the mortgage was an inseparable part, left in the hands of Atlas an unreasonably small capital for the business in which it was about to engage after the abstraction of cash from its account by the officers of the stock purchaser. 11 U.S.C.A. §§ 107, sub. d(1) (d); 107, sub. d(1) (e) (1); 107, sub. d(2) (b). To a similar effect, N.J.S. 25:2–9.; 25:2–11. Whether therefore, the validity of the mortgage is to be determined by the Bankruptcy Act, or by the statutory law of the State of New Jersey in which the mortgaged premises are located and the transactions reviewed took place, a similar conclusion of invalidity of the mortgage is inescapable.

While it may be argued that the Bornsteins may not have intended that the Atlas bank account should be reduced to as low a balance as that previously mentioned, they were fully cognizant of all of the transactions which necessarily accompanied the sale of their stock at the expense of their own corporation. In such circumstances, one who takes a mortgage executed for a fraudulent purpose, with knowledge of that purpose and to aid in the execution of the purpose, may not prevail against those who are defrauded thereby. Moore v. Williamson, 1888, 44 N.J.Eq. 496, 505, 15 A. 587, 1 L.R.A. 336. Concluding, as we must, that the mortgage here in question was born in fraud, the ostensible legal form of the mortgage and of its assignment will not suffice to cloak the fraud with immunity. Catabene v. Wallner, App.Div. 1951, 16 N.J.Super. 597, 602, 85 A.2d 300. The Referee was, therefore, amply justified in the evidence to infer, as he did, that the Bornsteins knew that they could not obtain the $250,000 on account of the price for which they were selling their stock except by means of the mortgage from which Atlas would not and did not derive any ultimate benefit. There is ample basis in the evidence for concluding that the Bornsteins expected, and therefore intended, that Atlas would not derive any ultimate benefit from its receipt of the $250,000 loan and they may not be heard to avoid responsibility for the consquences by closing their eyes to certain phases of the transactions which would have been apparent had their eyes remained open; for "A man cannot successfully claim that he is acting honestly when he wilfully shuts his eyes for fear that leaving them open will reveal unpleasant facts." Chorost v. Grand Rapids Factory Showrooms, Inc., 3 Cir., 1949, 172 F.2d 327, 329; Matthews v. Pope, 1923, 95 N.J.Eq. 76, 121 A. 746; Horton v. Bamford, 1911, 79 N.J.Eq. 356, 81 A. 761; Moore v. Williamson, supra.

■■ The second question posed by the Referee respecting the effect of the execution of an agreement extending the mortgage, in the proceeding for an arrangement under Chapter XI of the Bankruptcy Act, as an estoppel against an attack upon the validity of the mortgage does not arise upon the facts as this Court finds them to be. Estoppel, whether equitable or in pais, arises upon the doctrine "that one shall not be permitted to repudiate an act done or position as-

sumed where that course would work injustice to another who, having the right to do so, has relied thereon." New Jersey Suburban Water Co. v. Harrison, E. & A.1939, 122 N.J.L. 189, 194, 3 A.2d 623, 626. The Bornsteins were not harmed by any acts of the bankrupt or of its Trustee in the Chapter XI proceedings, not only because those proceedings could not reach the Bornsteins as secured creditors, but also because they were fully cognizant of the infirmities of the mortgage obligation and were actually benefited by the interval of time during which they received payments on account of the mortgage. In fine, the statutory jurisdiction under Chapter XI did not extend to the Bornsteins. 11 U.S. C.A. § 706(1); S. E. C. v. United States Realty & Improvement Co., 1940, 310 U. S. 434, 60 S.Ct. 952, 84 L.Ed. 1293. I, therefore, find no basis in the evidence in this case for concluding that the Trustee has been estopped to assert the invalidity of the subject mortgage at this time. That mortgage not being a valid lien against the bankrupt's real estate, it follows that no lien in favor of the petitioners exists against the proceeds of sale of the mortgaged property.

The decision of the Referee is affirmed, and an order may be presented in conformity with the conclusions herein set forth.