In re **VADNAIS LUMBER SUPPLY, INC.** **d/b/a Churchill Forest Products d/b/a Industrial Forest Products, Debtor.**

**VADNAIS LUMBER SUPPLY, INC. d/b/a Churchill Forest Products d/b/a Industrial Forest Products, Plaintiff,**

v.

**James P. BYRNE, James Kaveny, a/k/a James Kaveney, Edward T. Mis, Jr., Andrew F. Sears, Defendants.**

**Bankruptcy No. 88–40487–JFQ. Adv. No. 88–4056.**

United States Bankruptcy Court, D. Massachusetts.

May 24, 1989.

Joseph Reinhardt, Hendel, Collins & Newton, Springfield, Mass., for Vadnais Lumber Supply Inc., debtor, plaintiff.

William Murray, Murray, Fitzgerald, Sabella & Donahue, West Springfield, Mass., for James P. Byrne, James Kaveny, Edward T. Miss, Jr. & Andrew F. Sears, defendants.

## OPINION

JAMES F. QUEENAN, Jr.,
Bankruptcy Judge.

This litigation follows in the wake of a leveraged buyout of Vadnais Lumber Supply, Inc., the debtor in this Chapter 11 proceeding (the "Debtor"). It is apparently a case of first impression concerning the fraudulent transfer consequences of stock redemptions accompanied by noncompetitive covenants to which separate considerations have been allocated. Also presented are questions under preference law of business valuation in determination of insolvency and application of the so-called "earmarking" doctrine. We set forth here completely amended findings of fact and rulings of law pursuant to motions filed by the parties to amend prior judgments and the findings and rulings thereunder.

The Debtor is in the business of selling lumber to contractors for use in construction and to industrial concerns for use in operations or the maintenance of property. For several years prior to the events in question ownership of its outstanding capital stock was equally divided among the following five individuals: David C. Derby, Andrew F. Sears, James Kaveny, Edward T. Mis, Jr. and James P. Byrne. The defendant Sears was president, the other defendants were vice-presidents, and Derby, who is not a defendant, was treasurer; all served as directors. All were employed by the Debtor on a full-time basis. Sears managed the office in Springfield, Massachusetts and oversaw operations at the Debtor's Hanson, Massachusetts location. Kaveny was in charge of sales in Massachusetts and parts of Vermont and New Hampshire, as well as overseeing the Debtor's operations in Bellingham, Massachusetts. Mis was in charge of sales in Connecticut. Byrne managed the Debtor's industrial forest products division, which handled sales of high quality maple and particle board for cabinets. (The so-called "Vadnais division" made sales of other products). Derby's duties were primarily financial. The Debtor's main office was in Springfield; its sales area included all of Massachusetts, Connecticut and Rhode Island, as well as the eastern portion of New York and the lower portions of Vermont and New Hampshire.

During 1987 a rift developed among the five stockholders over matters not pertinent here. In 1987 the Debtor also began to sustain operating losses due to uncontrolled growth. The five stockholders split into two camps, with Derby in one and his four co-stockholders in the other. Derby's duties were changed, and the others began casting about for a way either to buy him out or sell to a third party. In November

1987 Lawrence and Patrick O'Toole, two brothers who had previously held a major stock interest in the Debtor, offered in writing to purchase all the company's assets and related business real estate owned by the stockholders for $500,000 and the assumption of all liabilities. That offer was not accepted.

Soon thereafter, the parties worked out an arrangement whereby Derby would stay with the company and the other four would sell. On December 7, 1987 the five stockholders and the company signed an agreement (the "Sales Agreement") containing these features: (i) the sale to the Debtor of the eighty percent stock interest held by the four defendant stockholders at a price of $100,000, of which $20,000 was paid immediately and $80,000 was payable at the closing scheduled in January; (ii) the agreement of the selling stockholders that for one year after the closing they would not sell to certain customers of the Debtor in some but not all of its product lines, for a consideration of $300,000 payable $100,000 at the closing and $200,000 in 17 equal monthly installments commencing March 1, 1988 and continuing through July 1, 1989; (iii) payment by the Debtor at the closing of its entire debt to the selling stockholders for loans and expense reimbursement, totalling over $300,000; (iv) the sale to Derby, for a stated consideration of one dollar, of the sellers' eighty percent interest in the parties' two partnerships which owned real estate occupied by the Debtor; (v) Derby's commitment to arrange financing for the foregoing by agreeing to make a $22,000 capital contribution and "put into" the Debtor the required balance. The Sales Agreement further provided that Derby was to become the company's chief executive officer immediately rather than after the closing. The sellers signed written resignations from their posts as officers and directors which were delivered in escrow to become effective upon completion of the closing.

Derby thereafter obtained the required financing through personal loans. He made the stipulated $22,000 capital contribution. At the closing held on January 19, 1988, Derby advanced the necessary additional funds as loans to the Debtor; the defendants received the sums then due them under the Sales Agreement either in cash furnished by Derby or in inventory, receivables or customer accounts transferred to them by the Debtor at agreed values. All four of the defendants then went into the lumber business in the Springfield area in competition with the Debtor, as permitted by the limited noncompetitive convenants in the Sales Agreement. Sears, Mis and Kaveny formed New England Lumber Specialties, Inc. Byrne formed Prime Plywood and Panel, Inc. Mis also conducted sales activities in unincorporated form under the name Lumber Specialty Products. These activities of Mis were initially confined to servicing one account, Northeast Nuclear Co., which he purchased from the Debtor at the closing for $37,000 applied as a credit against the Debtor's obligation to him under his noncompetitive covenant.

After the closing Derby attempted to perform the duties previously discharged by all five of the stockholders. Although Derby is capable, the Debtor suffered from loss of the management and sales talents of the four defendants. Other troubles afflicted the Debtor, and on August 11, 1988 it filed a petition in this Court seeking to reorganize under Chapter 11. This adversary proceeding followed. The Debtor has since placed in escrow with its attorney all monthly payments for the noncompetitive covenants of Sears, Byrne and Kaveny as they became due. It has made no payments for Mis's covenant since March 1988.

The foregoing sets forth the factual situation in general outline. Further findings are contained in discussion of the legal issues.

## I. PREFERENCE ISSUES

The Debtor's indebtedness of over $300,000 to the defendants for loans and expense reimbursement was discharged at the closing or shortly thereafter through a combination of cash payments and property transfers. The following loans were discharged at the closing: Sears—$92,031.24;

Mis—$68,340.92; Byrne—$21,137.37; Kaveny—$127,602.34. On or about February 14, 1987 the Debtor paid these debts owed the defendants for expense reimbursement: Sears—$409.00; Mis—$4,205.78; Kaveny—$1,132.40; Byrne—$1,759.00. The Debtor seeks to avoid all of these transactions as preferences under § 547 of the Bankruptcy Code, 11 U.S.C.S. § 547 (Law.Co-op.1986 & Supp.1988). We deal only with the issues under § 547 which have been argued by the parties.

## A. *Insider Preference Period*

█ Transfers to creditors made outside the 90 day prepetition period but within one year of the petition filing date are avoidable as preferences only if the recipient is an "insider" of the debtor "at the time of such transfer." § 547(b)(4)(B). An insider of a corporate debtor is defined to include an officer or director or one in "control" of the debtor, "control" being an undefined term. § 101(30).

The defendants were insiders at the time of all these payments. First, they were still officers and directors at the closing. Although they had signed written resignations on December 7th, the resignations were held in escrow in order not to be effective until completion of the closing. Second, the defendants were in control at the closing by reason of their eighty percent stock interest and the offices which they held. That control, furthermore, continued with respect to the small expense reimbursements made thereafter, even though the resignations were then effective and the stock sales had been completed. The payments received after the closing were made pursuant to the written agreement of December 7th when the defendants were in control. Payments made after technical control ceases, but committed to while it exists, present the same potential for abuse posed by payments to parties then in control. The fact of control prompts the payment and its timing in both situations. There should be no difference between them where, as here, the contractual commitment is made during the one year period.

## B. *Issue of Debtor's Solvency*

To be voidable under § 547 the transfer or obligation must occur while the debtor is insolvent. A business entity is insolvent within the meaning of the Bankruptcy Code if "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ..." § 101(31)(A). The defendants contend that the Debtor was solvent at the time of the payments, relying upon the O'Toole offer and deprecating the Debtor's recent losses as being the result of two factors not present after the closing—friction among the owners and uncontrolled professional fees. The Debtor's case of insolvency was based upon the testimony of an accountant who looked primarily to book values of assets rather than the presence or absence of a going concern value of the enterprise as a whole.

█ The proper standard of valuation to be applied in determination of solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities. *Pittman v. Union Planters Nat'l Bank & Trust Co. (In re Nat'l Cottonseed Products Corp.)*, 118 F.2d 211, 214–15 (6th Cir.1941); *J.W. Butler Paper Co. v. Goembel*, 143 F. 295 (7th Cir.1905); *In re Gibson Hotels, Inc.*, 24 F.Supp. 859, 863 (S.D.W. Va.1938); *Chicago Title & Trust Co. v. John A. Roebling's Sons*, 107 F. 71 (D.Ill. 1901); 2 *Collier on Bankruptcy* ¶ 101.31 at 101–93 (15th ed. 1988). Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic. *Mitchell v. Inv. Sec. Corp.*, 67 F.2d 669, 671–72 (5th Cir.1933); *In re Windor Indus., Inc.*, 459 F.Supp. 270, 276–77 (N.D.Tex.1978). Although quite weak after the closing, the Debtor was still able to continue its business operations without the aid of a bankruptcy court until the following August, and it has been operating under the umbrella of Chapter 11 since then. A going concern standard of valuation is therefore appropriate, with an adjustment to reflect the transfers

made and obligations incurred for which the Debtor received no consideration.

The traditional method for determining going concern value is by capitalizing net profit. A net profit figure is selected which represents current annual earning capacity; the amount is usually based upon recent earnings history, with weighing to reflect current trends or other factors. This sum is then multiplied by a factor which represents an appropriate multiple of earnings in light of the ratio of stock prices to earnings in that type of business. J. Bonbright, *The Valuation of Property,* 237–38 (1937); A. Dewing, *Financial Policy of Corporations,* 287 (5th ed. 1953); G. McCarthy & R. Healy, *Valuing A Company,* 37–38, 109–95, 334–79 (1971).

The Debtor had a record of earnings until the fiscal year ending March 31, 1987. If despite its new interest expense and other problems it had the ability to generate even a small profit immediately after the closing, any capitalization of that profit would indicate the existence of some minimal going concern value and therefore solvency. One of the O'Toole brothers testified that he still had confidence in the Debtor's ability to generate a profit. But there was no hard evidence supporting any such ability. The Court is certainly unable to find it in light of the large loss of $471,457 incurred during the nine months ending December 31, 1987 and the losses incurred since then. We must therefore look to other evidence bearing on the Debtor's value.

Although it may be that an unaccepted offer for an entire business (assets less liabilities) can be evidence of at least a minimum going concern value, the $500,000 O'Toole offer has detractive features. It was contingent upon the O'Tooles being able to obtain financing of $3,500,000, which obviously included funds for working capital, without any specification that collateral other than the Debtor's assets or the related real estate would be offered. There was no showing that the O'Tooles could obtain such financing. If they hoped to obtain it solely on the security of the Debtor's assets and operations, I find it unlikely that they would have been successful. The O'Toole offer, furthermore, would have to be reduced by the adjustments later referred to in the discussion of the price under the Sales Agreement as evidence of value.

The testimony of the Debtor's accountant is also of limited help. Much of his testimony was not even in terms of asset market value, much less enterprise going concern value. The accountant spoke primarily in reference to book values, which are essentially historic cost figures. To be sure, for certification purposes an accountant will value inventory at the lower of cost or market, and the accountant here purported to use lower market values of inventory as of December 31, 1987, in disagreement with the values on the balance sheet which he had prepared as of that date on a so-called "review" basis. But he never performed the audit procedures that are necessary to certify to a lower inventory market value. Much the same can be said for his testimony on the value of receivables and other property. More fundamentally, the accountant looked only to specific assets and displayed no depth of knowledge of the business itself, a depth which is so necessary to evaluate an entire enterprise. I find the accountant's testimony to be no more persuasive than the O'Toole offer.

In theory, the $400,000 paid for the defendants' eighty percent interest, with adjustments, is the most probative evidence concerning solvency or insolvency. That price, after all, involved a majority interest in the very corporation to be valued, and the sale took place at the precise time in question. The price could be adjusted upward by $100,000 to reflect the other twenty percent interest, and then downward by $400,000 to reflect the transfers and obligations for which, as we conclude in the later discussion of fraudulent transfer law, the Debtor derived no benefit. A further downward adjustment would be required because the $400,000 price (technically $400,001) included an eighty percent interest in two real estate partnerships. But the value of these partnerships was not placed in evidence, so that the Sales Agree-

ment does not provide any more guidance than does the other evidence.

The evidence on the issue of insolvency is therefore in equipoise, with neither party giving the Court sufficient information to resolve the issue. The Debtor, however, has the burden of proof. § 547(g). It has not sustained that burden.

## C. *Issue of Property Transfers by Debtor—the Doctrine of "Earmarking"*

■ Although our conclusion of the question of insolvency is determinative, we will deal with issues concerning the transfer of funds and the so-called "earmarking" doctrine in order to make related findings and rulings in the event of an appeal. Issues concerning the transfer of funds, moreover, have equal relevance in fraudulent transfer law, which is treated in the next section. All funds paid at the closing of January 19th were raised by Derby personally through bank loans and loans from relatives, friends and employees. As Derby raised the money between December 7th and January 19th, he delivered and endorsed checks to the Debtor's attorney, Michael Parker, who deposited the funds in his general client trustee account. Parker also had on deposit in that account funds of various clients, including funds which he obtained for the Debtor in the collection of its accounts receivable. He kept separate ledger cards for each client. Unlike the proceeds from collection of the Debtor's receivables, the funds received from Derby were recorded in Derby's rather than the Debtor's name. Parker testified, and I so find, that these funds remained Derby's property. At the closing, Parker drew checks on the account which were payable directly to the defendants (and in one case to a bank creditor of a defendant). Several weeks after the closing, Parker transferred to the Debtor the surplus which remained in the Derby account; this surplus came about because the Debtor satisfied some of its obligations at the closing through property transfers.

A preference does not take place unless the transaction involves a "transfer of an interest of the debtor in property."

§ 547(b). Under the similar language contained in § 60 of the Bankruptcy Act of 1898, no transfer of the debtor's property was considered to occur when a third party paid the creditor directly. *Nat'l Bank of Newport, New York v. Nat'l Herkimer County Bank of Little Falls,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912). This is precisely what happened here. Derby, through the agency of Parker, paid the funds that went to the defendants at the closing. The Debtor argues that *Nat'l Bank of Newport* should not control because it dealt with a payment made by a surety, whereas Derby had no surety relationship concerning this indebtedness. But the Court's reasoning was not so confined. It placed emphasis upon the funds never becoming part of the Debtor's property rather than upon the motive for payment. *Nat'l Bank of Newport* continues to control under the present Bankruptcy Code; there is nothing in the legislative history of § 547 to the contrary. In any event, the wording of the statute requires the conclusion that these payments are not preferences because they do not represent transfers of the Debtor's property. The Debtor's property remained unchanged. All that transpired was a substitution of Derby for the defendants as creditors. Because the Debtor's property was never reduced, other creditors were not prejudiced.

The Debtor also seeks to distinguish *Nat'l Bank of Newport* on the ground that Derby had a contractual obligation to advance money to the Debtor which thereby gave the Debtor an interest in the funds advanced by Derby, and because of this the funds did not have to become property of the Debtor in the title sense. This somewhat metaphysical argument lacks reality. The Debtor did indeed have the right to require Derby to satisfy the Debtor's obligations to the defendants. But this contractual right, which is a property interest, was not transferred. Rather, Derby's payments to the defendants satisfied the obligation. It is true, as argued by the Debtor, that Derby's direct advance to the defendants created indebtedness owed him by the Debtor every bit as much as funds advanced to the Debtor would have done.

134

That, however, is the point; there has been a mere substitution of creditors here without any property transfer.

It is therefore unnecessary to consider the so-called "earmarking" doctrine, which has been argued by the parties. That doctrine, an extension of the *Nat'l Bank of Newport* decision, is relevant in the situation where the third party furnishing the funds first transfers them to the debtor who pays the creditor. The question under the doctrine then becomes whether the debtor had so little control over the disposition of the funds that the payment should be treated in the same fashion as one made by the third party directly to the creditor. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351 (5th Cir. 1986); *Grubb v. Gen. Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938); *In re Henry C. Reusch & Co., Inc.*, 44 F.Supp. 677 (D.N.J.1942). One court has noted that the earmarking doctrine presents strong equities where the third party is a surety because it avoids the risk of the surety having to pay twice, but that court questioned its extension beyond the surety relationship. *McCuskey v. The Nat'l Bank of Waterloo (In re Bohlen Enter., Ltd.)*, 859 F.2d 561, 566 (8th Cir.1988). None of these questions are before us. These funds went directly from Derby to the defendants; there is no occasion to "earmark" any funds of the Debtor.

## II. STOCK REDEMPTIONS AND NON-COMPETITIVE COVENANTS AS FRAUDULENT TRANSFERS OR FRAUDULENT OBLIGATIONS

### A. *Fraudulent Transfer Law—Relationship Between Covenants and Transfer of Goodwill*

The Debtor seeks to avoid its remaining contractual obligations for the noncompetitive covenants, and to recover all monies and other property transferred for the covenants and stock, on the ground that these payments and obligations are fraudulent as to creditors. In cash or agreed property values, $25,000 has been paid to each of the defendants in redemption of their stock. Of the $75,000 owed to each defendant on his covenant, $45,588.26 has been paid to each of Byrne, Kaveny and Sears and $38,941.18 has been paid to Mis. In the exercise of powers granted it by § 544(b) of the Bankruptcy Code, 11 U.S.C.S. § 544(b) (Law.Co-op.1986 & Supp.1988), the Debtor may avoid for the benefit of all creditors any transfer or obligation that is voidable by an existing creditor under the provisions of the Uniform Fraudulent Conveyance Act as in effect in Massachusetts, Mass.Ann. Laws ch. 109A (Law.Co-op.1985 & Supp. 1989). *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931). And because these transfers and obligations occurred within the year before the Chapter 11 filing date, the Debtor may also assert avoidance rights under the similar provisions of § 548 of the Bankruptcy Code, 11 U.S.C.S. § 548 (Law.Co-op.1986 & Supp.1988). We shall deal only with § 548. The parties have confined their arguments to this statute, and in our view the disposition would be the same under either § 548 or the Massachusetts statute.

■ It has been argued that a leveraged buyout should not be subject to fraudulent transfer law. Baird & Jackson, *Fraudulent Conveyance Law and its Proper Domain*, 38 Vand.L.Rev. 829 (1985). Baird and Jackson contend that creditors should have no more rights concerning a leveraged buyout which precedes a debtor's collapse than they do with respect to any other business transaction which turns out poorly. *Id.* at 831–34. Although conceding that gifts by insolvents should be actionable without regard to intent, they would leave fraudulent transfer law in Elizabethan times and claim exemption for leveraged buyouts because of their modern business context and an assumed absence of actual fraudulent intent on the part of their participants. *Id.* But a transaction which at the outset gives the debtor no value and leaves it insolvent or with unreasonably small capital is quite different from one which merely turns out poorly in the end. The Baird and Jackson arguments are unconvincing in both their logic and their inconsistency with the express wording of the fraudulent transfer statutes. Most

courts have rejected them. *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Wieboldt Stores, Inc. v. Schottenstein Stores Corp.*, 94 B.R. 488 (N.D.Ill.1988); *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 B.R. 154 (Bankr.D.Cal.1988); *In re Ohio Corrugating Co.*, 70 B.R. 920, 926 (Bankr.N.D. Ohio 1987); *In re Anderson Indus., Inc.*, 55 B.R. 922, 926 (Bankr.W.D.Mich.1985). *But see Kupetz v. Wolf (In re Wolf & Vine)*, 845 F.2d 842 (9th Cir.1988); *Credit Managers Ass'n of Southern California v. The Federal Co.*, 629 F.Supp. 175 (C.D.Cal. 1985) (amended 1986).

The stock redemptions and noncompetitive covenants before us should be treated as ancillary to each other under principles of fraudulent transfer law. That is their treatment under contract law, which looks to the economic reality of the transaction. Indeed, a covenant not to compete in connection with the sale of a business escapes unenforceability as an invalid restraint upon trade only because it is ancillary to a valid business sale. *Restatement (Second) of Contracts*, § 188 (1979). The covenant is viewed as a reasonable restraint upon trade because of the buyer's need to protect the value of the goodwill being sold. In essence, the seller is viewed as agreeing not to act so as to diminish the value of the goodwill which he sells and for which he is paid. *Id.*, Comment f. That is particularly true here. The defendants were all intimately involved in the Debtor's business and its goodwill, particularly customer goodwill. The Debtor's business is one which is so sales-driven that no aspect of management is isolated from sales. These covenants and stock sales are inseparable because of the covenants' relationship to the Debtor's goodwill.

Goodwill has been referred to as the "advantage or benefit which is acquired by an establishment beyond the mere value of the ... property employed therein, in consequence of the general public patronage ..." Storey, *Partnerships*, § 99 (7th ed. 1881). Although commonly used to describe the advantageous relationship that a business enjoys with its customers, goodwill also embraces advantageous relationships with employees, suppliers, lenders and others. Commons, *Industrial Goodwill*, 18–26 (1919); *Grace Bros., Inc. v. Commissioner*, 173 F.2d 170 (9th Cir.1949). A seller of a business understandably wants to be paid the value of his interest in the entire business, including its goodwill. Where the seller has been active in the business, particularly if it is a relatively small one, the buyer is faced with the fact that the seller's personal relationship with customers and others is an important source of business goodwill. Although sources such as a tradename or a location are readily transferable, the individual seller's goodwill is obviously not. What the buyer does, of course, is to obtain from the seller some form of covenant not to compete. The covenant is merely one of two supplemental methods of transferring goodwill. The buyer is furnished with the symbols which have evoked a favorable response from customers and others, and the seller, through the covenant, is eliminated as an alternative attraction. *See Malcolm J. Watson*, 35 T.C. 203 (1960); Note, *An Inquiry into the Nature of Goodwill*, 53 Colum.L.Rev. 660 (1953).

The Supreme Judicial Court of Massachusetts recognizes the close relationship between restraints upon competition and the transfer of goodwill in the sale of a business. *Tobin v. Cody*, 343 Mass. 716, 180 N.E.2d 652 (1962) involved the sale of a fifty percent capital stock interest under an agreement which made no reference to the seller's later competition or the transfer of business goodwill. The court nevertheless imposed upon the sellers an implied agreement not to compete so that they would not derogate from the goodwill which was in fact sold. In doing so, the court affirmed the injunction entered by the trial judge prohibiting the sellers from engaging in the corporation's line of business, within its geographic area, for the rest of their lives.

The approximate dollar values involved here lend support to the view that the defendants' covenants are part and parcel

of their stock sales. The $500,000 offer made by the O'Tooles represented the O'Tooles' estimate of the value of the business and individually owned real estate. The ultimate sale involved an eighty percent interest for a consideration of $400,000, eighty percent of the O'Toole offer, with $100,000 allocated to the stock and $300,000 to the covenants.

### B. *Reasonably Equivalent Value Under § 548*

 Where, as here, an actual intent to defraud creditors is not alleged, the plaintiff must prove that the "debtor ... received less than a reasonably equivalent value" in the exchange. § 548(a)(2)(A). Two things are clear from this language. The debtor must receive the required value, not some third party. *E.g., Klein v. Tabatchnick,* 418 F.Supp. 1368 (S.D.N.Y. 1976). And, unlike the doctrine of consideration in contract law, that value must pass a measurement test. In applying the test, we must examine all aspects of the transaction in order to measure carefully the value of all of its benefits and burdens to the Debtor, direct or indirect. *Rubin v. Mfr. Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981).

 When a corporation purchases its own stock, it receives no direct consideration in return, whether or not the stock would have value to another purchaser. Both fraudulent transfer law and corporate law protect creditors by treating the purchase as a form of distribution to the selling shareholders, a reduction in net worth rather than the acquisition of an asset. *Consove v. Cohen (In re Roco Corp.),* 701 F.2d 978, 982 (1st Cir.1983); *Gold v. Lippman (In re Flying Mailmen Service, Inc.),* 539 F.2d 866, 870 (2d Cir.1976); *Robinson v. Wangemann,* 75 F.2d 756, 757 (5th Cir.1935); *Revised Model Business Corp. Act* § 6.40 (1984). Treasury shares acquired by the corporation are worth no more to it than its authorized and unissued shares. *Consove,* 701 F.2d at 982. Because the corporation already owns its own assets, its ownership of an interest in those assets adds nothing.

Nor does a corporation acquire anything of value *to it* when stock redemptions are accompanied by covenants not to compete from the sellers. Although the covenants assist the transfer of goodwill in a sale between third parties, that is not so where the sale is to the corporation itself. The corporation already owns its goodwill, so that there is no transfer of value to it when it acquires a covenant in connection with a stock redemption, any more than there is in the redemption itself.

A comparison of the Debtor's rights before and after the sale concerning the defendants' competition is instructive. Prior to the sale, its owners and officers posed no competitive threat to it. Even if the defendants wanted to compete with their own corporation, certainly an unlikely supposition, their fiduciary obligations of loyalty would have prevented them from doing so. After the sale, the Debtor has protection from their competition only through the covenants. That protection gives the Debtor nothing more than its prior assurance, both practical and legal, that its directors and officers would not violate their fiduciary obligations by engaging in competitive activities.

The Debtor actually came out less than even in the exchange. It replaced the defendants' broad noncompetitive obligations as fiduciaries with restrictive obligations under the covenants. The defendants' covenants obligated them for just one year, and they applied only to sales to customers in certain product lines rather than competition generally. Consistent with these limitations, the defendants immediately went into competing businesses. Surely the Debtor lost rather than gained a competitive advantage from the transaction. Moreover, had the Sales Agreement said nothing about competition, the Massachusetts courts would have imposed an implied agreement not to compete which would have likely been broader in scope than the covenants actually received. *Tobin v. Cody,* 343 Mass. 716, 180 N.E.2d 652 (1962). And the Debtor lost more in the sale than a competitive advantage. It also

lost the services of most of its management.

The defendants argue that this case is quite different from *Tobin v. Cody* because here there were express noncompetitive covenants, so that none can be implied, and here the express covenants gave value to the Debtor in that they protected it from ruinous competition by individuals no longer bound by fiduciary duties of loyalty. But the function of the express covenants here is the same as that of the covenants inferred by the court in *Tobin v. Cody*—the protection of goodwill in connection with the transfer of stock. Unless the covenants performed that function, they would be voidable as an invalid restraint on trade. Because the stock transfer here is to the Debtor of its own stock, the Debtor received no value from the covenants because their function was to preserve the goodwill interest in the stock whose purchase gave the Debtor no value.

In summary, the Debtor lost rather than gained value in a transaction in which it made transfers and incurred obligations totalling $400,000 ($300,000 for the covenants, $100,000 for the stock). Clearly it received no value, much less "reasonably equivalent value" within the meaning of § 548.

## C. *Issue of Debtor's Unreasonably Small Capital*

Section 548 also requires the Debtor to prove that the transfers and obligations resulted in, or were contemporaneous with, any one of three financial circumstances concerning the Debtor: (i) "insolvency," (ii) "unreasonably small capital," or (iii) that the Debtor "intended to incur, or believed ... it would incur debts that would be beyond the debtor's ability to pay as such debts matured." Insolvency has been treated earlier in the discussion of preference issues. Because the statute is in the disjunctive, we deal only with the issue of unreasonably small capital, finding and ruling that this element has been established. We use the date of the closing, January 19, 1988, as the critical date. All but $20,000 of the allegedly fraudulent transfers and obligations occurred then, and no significant event transpired between the execution of the Sales Agreement and the closing date.

The phrase "unreasonably small capital" is not defined in either § 548 or the Uniform Fraudulent Conveyance Act. The Uniform Fraudulent Transfer Act substitutes "assets" for "capital" in order to avoid possible confusion with the corporate law concept of capital, funds permanently invested in the business, which has no relevance in fraudulent transfer law. U.F.T.A. § 4, comment (4). The courts have applied the fraudulent transfer concept by looking to the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself. *E.g., Credit Managers Ass'n of Southern California v. The Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1985) (amended 1986); *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.,* 475 F.Supp. 693 (D.Nev.1978), aff'd without opinion 633 F.2d 225 (9th Cir.1980); *In re Atlas Foundry Co.,* 155 F.Supp. 615 (D.N.J.1957); *Zuk v. Hale,* 114 N.H. 813, 330 A.2d 448 (1974).

Unreasonably small capitalization is not the equivalent of insolvency in either the bankruptcy or equity sense. The statute uses insolvency in the bankruptcy sense, an excess of liabilities of asset values (11 U.S.C. § 101(31)), as an alternative test. The concept of equitable insolvency, inability to pay debts as they mature, is well known. *See, e.g., Revised Model Business Corp. Act.,* § 6.40 (1984). If the intention was to refer to equitable insolvency, Congress certainly would have used that term or its definition. And yet, because fraudulent transfer law is designed to protect creditors, the financial condition intended must be related in some way to ability to pay debts. Unreasonably small capitalization therefore encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future. The sparse case law points in this direction. *E.g., In re Process–Manz Press, Inc.,* 236 F.Supp. 333, 347 (N.D.Ill.1964); *In re Atlas Foundry Co.,* 155 F.Supp. 615, 618 (D.N.J.1957).

■ Immediately after the closing of January 19, 1988, when the Debtor burdened itself with $400,000 of transfers and obligations from which it derived no benefit, it was facing five major problems: (1) Commencing with the fiscal year ending March 31, 1987 it had begun operating at an increasingly heavy loss; (2) It had lost the services of four of the top five members of its management; (3) It was in the process of attempting to work out an agreement to pay its unsecured creditors over a period of time; (4) Its relationship with its principal bank, Connecticut National Bank, had badly soured; and (5) It faced restricted competition from the defendants during the first year and unrestricted competition thereafter. We deal with each problem separately.

### 1. Debtor's Recent Losses

By January 19, 1988 the Debtor was incurring heavy losses. Its financial statements (prepared by certified public accountants on a "review" basis rather than after audit, with fiscal years originally ending on March 31st), show these operating results:

 *1983*—net sales of $2,978,316 and net profit (after tax payable or refund) of $42,544;

 *1984*—net sales of $5,048,690 and net profit of $57,179;

 *1985*—net sales of $7,177,354 and net profit of $80,832;

 *1986*—net sales of $9,547,507 and net profit of $154,721;

 *1987*—net sales of $12,580,525 and net loss of $106,049;

 Year Ended 12/31/87 (9 months)—net sales of $11,383,821 and net loss of $471,457.

The prime reason that operations went from black to red was uncontrolled growth leading to general inefficiency in operations. On January 19th the business had very serious organizational problems which would not be solved merely by termination of internal friction or employment of new professionals at more reasonable rates, as the defendants argue.

### 2. Loss of Defendants' Management Skills

As discussed, the termination of the defendants' employment represented a net loss to the Debtor, beyond any benefit derived from the ending of internal strife. The defendants are capable businessmen with substantial experience in the lumber business. Together, with Derby, they offered better management then Derby can provide alone. The defendants' mistake in permitting uncontrolled growth is a common one. It was, moreover, a mistake shared by Derby; his prime duties with the Debtor were then in the financial area.

### 3. Problem with Trade Creditors

The Debtor was many months in arrears in the payment of approximately $2 million of trade debt, and it had lost much of the goodwill previously enjoyed with these suppliers. On December 21, 1987 the Debtor wrote to its unsecured creditors proposing to pay them in full in equal monthly installments over 24 months at an interest rate of three points under prime, stating that it was on the "brink of insolvency." By the closing date of January 19th, creditors holding somewhat less than seventy-five percent of the debt had assented to the two-year payment plan. By January 25th, creditors holding seventy-five percent of the debt had assented, and on that date the Debtor sent all creditors the first monthly payment of about $90,000. (It was able to make only two more.) The Debtor's goal was to obtain acceptances from all creditors in order to avoid suits by a disgruntled, nonaccepting minority. Although there may have been reason on the closing date for believing that close to 100% acceptance could be achieved, the Debtor's ability to obtain such acceptances and make payments under the plan was then far from a certainty. What was certain was that the Debtor's credit standing had been severely damaged.

### 4. Banking Relationship

Connecticut National Bank was the Debtor's principal lender. It and the Debtor had a revolving loan arrangement whereby

the bank, in its discretion, would loan up to certain percentages of current receivables and inventory values. By the fall of 1987, the bank was quite concerned about the Debtor's operating losses and the internecine warfare among its stockholders. Beginning in early October it financed only inventory purchases for which the Debtor already had a sale. The relationship improved somewhat after the December 7th Sales Agreement and the January 19th closing thereunder because the sale alleviated the bank's concern about strife among the stockholders. But the bank remained troubled by the Debtor's operating losses. Although the amount of the current losses was not known until a few months after the closing when the statements for the nine months ending December 31, 1987 were prepared, the large arrearage in trade debt made it obvious to all that there were heavy current losses. The bank remained unwilling to loan up to the percentages of receivables and inventory upon which loans had been made previously. A few months later the bank terminated all advances. In summary, the Debtor's lending relationship was shaky on January 19th and its financial condition gave no reason to be optimistic about an improvement in that relationship.

#### 5. *Defendants' Competition*

As previously discussed, after the January 19th closing the Debtor faced a competitive threat from the defendants which did not exist before in either a practical or legal sense. That threat was not fully protected against by the defendants' limited noncompetitive covenants.

#### 6. *Conclusion*

By January 19th the Debtor's progress in its arrangement with creditors may (or may not) have suspended its condition of equitable insolvency. But the Debtor was then in a loss mode of operations, with less management, more competition, and a tenuous banking relationship. Most important, its poor financial condition was obvious. Despite all of this, the Debtor made or incurred $400,000 of transfers and obligations from which it derived no benefit.

And it obtained all the necessary funds by incurring even more debt to Derby rather than obtaining a capital injection. To make matters worse, Derby had himself borrowed the funds, so that he required current repayments. No reasonable projection of the Debtor's cash flow made on January 19th would have indicated that it had the ability to avoid insolvency. We have no hesitation in concluding that the remaining property of the Debtor after January 19th constituted unreasonably small capital within the meaning of § 548. We place no importance on the fact that in March of 1988 the Debtor suffered a fire at its Springfield headquarters. We must assess its financial condition in light of the circumstances existing on January 19th. The fire, moreover, caused only a temporary suspension in operations.

#### D. *Transfers at the Closing and on December 7, 1987*

Like § 547 governing preferences, § 548 governing fraudulent transfers (but not fraudulent obligations) applies only to a "transfer of an interest of the debtor in property." As noted in the earlier discussion of preference issues, the funds furnished by Derby at the closing and paid to the defendants consisted of transfers of Derby's property, not the Debtor's. These funds never became part of the Debtor's property. Creditors were therefore not prejudiced when the Debtor received no value from Derby's funds being applied in payment of the covenants or stock, any more than they were prejudiced when other portions of Derby's funds were applied to payment of only the defendants' indebtedness rather than in pro rata payment of all creditors. The prejudice to the Debtor results from the obligation which it incurred to Derby from these advances. This indebtedness to Derby would appear to be a fraudulent obligation, but that matter is not before us. Thus, the cash paid at the closing is beyond the reach of § 548. The same is true of the $5,000 received by each defendant on December 7th as a down payment on his covenant. These payments

were made by Derby's wife directly to each defendant.

The same is not true, however, of the in-kind transfers made by the Debtor for the covenants and stock. The Debtor made the following in-kind transfers at the closing: orders valued at $5,000 to Sears; property totalling $95,054.16 to Mis, comprised of lumber at $42,007.57, accounts receivable at $28,046.59 and the Northeast Nuclear account valued at $37,000 which was offset at the closing to the extent of $25,000; property valued at $8,465.18 to Kaveny, comprised of accounts receivable at $6,965.18 and existing orders at $1,500. The Northeast Nuclear transfer valued at $37,000 was treated by the parties at the closing as a full credit against the $25,000 then due on the covenant, with the balance of $12,000 being credited against later monthly payments on the covenant. Except for this specific allocation, these in-kind transfers are allocable to both (i) the $45,000 due at the closing to each of the defendants for stock and the covenants, and (ii) the defendants' respective loan indebtedness, namely: $92,031.24 owed Sears, $68,340.92 owed Mis, and $127,-602.34 owed Kaveny (there having been no in-kind transfers to Byrne). That allocation shall be made proportionately.

To summarize, the defendants have each received $25,000 in redemption of their stock and the following payments under the covenants: Sears—$45,588.26, Mis—$38,941.18, Byrne—$45,588.26, and Kaveny—$45,588.26. Excluded as voidable transfers, however, are (i) $5,000 which Derby's wife paid to each of the defendants on December 7th, and (ii) funds paid by Derby at the closing which are proportionately allocable to the stock and covenants. This leaves the following transfers which are voidable under § 548:

| | Sears | Mis | Byrne | Kaveny |
|---|---|---|---|---|
| Covenant only— at closing | $ — | $25,000.00 | $ — | $ — |
| Covenant & stock at closing | 1,640.00 | — | — | 2,209.41 |
| Stock only— at closing | — | 15,832.24 | — | — |
| Covenant— after closing | 20,588.26 | 13,941.18 | 20,588.26 | 20,588.26 |
| Totals | $22,228.26 | $54,773.42 | $20,588.26 | $22,797.67 |

### E. Subordination of Remaining Debt Under the Covenants

Because we hold that the remaining debt under the covenants is avoidable as a fraudulent obligation, we do not reach another possible impediment to that debt, which the Debtor has not argued. Conceivably, the covenant obligation could be subordinated under the doctrine which subordinates in a bankruptcy all debt owed in redemption of stock, whether or not the original transaction was fraudulent as to creditors, on the theory that a redemption of stock is, and remains, a dividend. McConnell v. Estate of Butler, 402 F.2d 362, 367 (9th Cir.1968); Robinson v. Wangemann, 75 F.2d 756, 758 (5th Cir.1935); Matthews Bros. v. Pullen, 268 F. 827 (1st Cir.1920).

### III. CONTRACTUAL RELIEF UNDER COVENANTS

■ The Debtor also seeks contractual damages for violations of the covenants. But the Debtor cannot have it both ways. In seeking and obtaining under fraudulent transfer law the right to avoid further covenant obligations, the Debtor's contractual rights thereunder necessarily cease. One cannot obtain the right to enforce and avoid obligations under a contract at the same time. Restatement (Second) of Contracts § 382 (1979).

■ The Debtor has no contractual right of recovery in any event. True, Mis breached his covenant. In February of 1988, thinking that the Debtor could not fill an order, Mis brokered a sale from another

supplier to a prohibited customer, Merrill Industries, Inc.; this involved a gross profit of $2,100 and a fee to Mis of much less. The Debtor was not required to accept the settlement offer of $2,100 which Mis made when he informed the Debtor of the sale. But the Debtor thereafter failed to honor its own contractual obligations to pay premiums on health insurance covering the defendants and their families. Mis, who has a daughter with juvenile arthritis, has incurred medical bills of over $6,000, which is in excess of the $2,100 damages incurred by the Debtor plus the $2,500 per person deductible under the policy.

The Debtor fares no better with respect to Mis's more general competitive activities which began in September of 1988 and involved sales to Merrill Industries, Inc., Connecticut Light & Power Co. and Packrite Co. By then, the Debtor had failed to make several monthly payments on Mis's covenant as a result of the imbroglio over the first Merrill Industries sale. Mis's offer of $2,100 cured his default in this connection. By September Mis was entitled to regard his own contractual obligations as terminated.

The Debtor's other complaints concerning the defendants' competitive activities are also without merit. The defendants' activities with Atlas/Copco and Milton Bradley consisted merely of quoting prices. The covenants, which were drafted by Derby on behalf of the Debtor, prohibited only sales, not solicitation. No implied obligation of good faith would include such minimal solicitation near the end of the one year period. Other customers complained of, John Carlo, Construction Associates, Inc. and J.A. Wright Co., Inc., were contractors; customers in the contracting business are not covered by the covenants. Moreover, the Debtor failed to introduce evidence of damages from any of these sales, other than the first sale to Merrill Industries, Inc. by Mis.

## IV. CONCLUSION

The Debtor shall recover judgments discharging it of all further liability under the noncompetitive covenants and establishing each defendant's indebtedness to the Debtor in the amount of the in-kind payments at the closing applicable to the covenants and stock plus the cash and in-kind payments made on the covenants thereafter. All preference and other claims are dismissed.

Separate judgments shall issue.